UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| ATMOSPHERE HOSPITALITY MANAGEMENT, LLC, | ) ) ) | CIV. 13-5040-KES |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| SHIBA INVESTMENTS, INC., KARIM MERALI, and ZELIJKA CURTULLO, | ) ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| Defendants and Third-Party Plaintiffs, | ) ) ) ) | |
| vs. | ) ) | |
| JAMES HENDERSON, | ) ) | |
| Third-Party Defendant. | ) | |

Plaintiff, Atmosphere Hospitality Management, LLC, moves for a preliminary injunction against defendants, Shiba Investments, Inc., Karim Merali, and Zelijka Curtullo. Atmosphere asks the court to enjoin defendants from using the Adoba® brand and processes associated with the brand and also asks the court to order Shiba to pay all debts owed to vendors incurred during the operation of the Adoba® hotel. Defendants resist the motion and claim they are entitled to continue using the Adoba® brand and processes associated with it in the operation of the hotel. The court held a hearing on this motion and heard testimony from James Henderson, Adrienne Pumphrey,

Karim Merali, and James Postma. For the following reasons, the motion for a preliminary injunction is granted in part and denied in part.

## BACKGROUND

Atmosphere is a Delaware limited liability company with its principal place of business in Colorado. Atmosphere is in the hotel hospitality business. James Henderson and Adrienne Pumphrey are managing partners of Atmosphere.

Shiba is a Texas corporation with its principal place of business in South Dakota. Shiba owns the hotel located in Rapid City, South Dakota, that is at the center of this litigation. Karim Merali is a resident of South Dakota and an equity owner of Shiba.

In May 2011, Merali and Henderson began discussing the possibility of Atmosphere taking over management of Shiba's hotel and re-branding it as an Adoba® hotel.[1] Atmosphere trademarked Adoba® and intended to create a hotel brand using the Adoba® name.[2] An Adoba® hotel uses "a green hotel design concept and operating standard . . . to maximize energy efficiency and apply environmentally responsible and sound operating and management standards and sustainable practices." Docket 37-3 at 1. There were no other

---

[1] At the time, the hotel was operating as a Radisson.

[2] Henderson testified that the Adoba® brand is his "life's work."

2

Adoba® hotels in existence at the time Henderson and Merali entered into discussions.[3]

The parties ultimately agreed that the hotel would re-brand as an Adoba® and that Atmosphere would manage the hotel as such. Henderson's attorney, Lyle Boll, drafted two contracts—a licensing agreement and a management agreement—to memorialize the parties' agreement, and the contracts were provided to Merali in either October or November of 2011. After Merali and his attorney reviewed the contracts, Merali asked for and received a copy of them in Microsoft Word format. Atmosphere informed Merali that it wanted to get the agreements signed before the end of 2011.

The parties dispute the events that took place from the time Merali received the contracts and December 31, 2011, the date the Licensing Agreement and Management Agreement were signed. Atmosphere claims very few discussions took place regarding the language of the contracts and that Merali often refused to respond to emails and phone calls. Merali claims he and Henderson spent several days discussing the various terms of the agreements and, at times, exchanged drafts.

On December 31, 2011, Merali sent Henderson an email at 4:59 p.m. that included the final version of the Licensing Agreement. The email stated, "Jim, Attached is the license Agreement... Please review and let me know if ok

_____

[3] The hotel would eventually become the first Adoba® hotel.

3

as per our discussions late last night." Exhibit Y. Later that same evening,

Merali and Henderson met in Merali's office, which is located in the hotel, and

signed both the Licensing Agreement and the Management Agreement.[4] Both

Henderson and Merali initialed or signed every page in each agreement.

> On January 8, 2012, Henderson sent Merali an email that said:
>
> The management contract as well as the license agreement we wrote is really not good. It is basically a 90 day contract and not worth anything to you or Atmosphere. . . . I suggest we write an addendum that omits that 90 day out and we write legitimate reasons why either can terminate, or, write more basic language. I had to show the agreement to my insurance company, Lyle and Wells Fargo in order to get insurance, show my lawyer and to open up an operating account with benefits at Wells Fargo, I asked your approval prior to showing any of these parties the other day. In unison, all the parties I just mentioned state the contract is worthless with that 90 day out term for any reason written in the contract.

Docket 35-1. No addendums, amendments, or changes were ever made to

either agreement, and the parties operated under the Licensing Agreement and

Management Agreement for over a year.

On April 23, 2013, Shiba, acting through its attorney, sent Atmosphere

an email informing Atmosphere that Shiba was canceling the Licensing

Agreement pursuant to § 3b and canceling the Management Agreement

pursuant to § 5.01(b). Additionally, the email indicated that "Shiba is electing

(per 3.(b). of the Licensing Agreement) to ' . . . keep the technology and the

---

[4] Henderson admits that he and Merali discussed certain changes that were made by Merali prior to Henderson signing the agreements.

Adoba Brand as an independent operation." Docket 31-25. Section 3b of the

Licensing Agreement states:

> Notwithstanding the foregoing, [Shiba] or Atmosphere can cancel
> this contract without cause with 90 days written cancellation at
> any time, without any penalties. This clause supersedes any other
> cancellation or termination clause in this entire agreement. Due to
> the nature and circumstances of a deep and long lasting
> friendship, [Shiba] and Atmosphere both agree that a termination
> will have significant impact on either party and as such each party
> should leave the agreement with vested interest. [Shiba] will keep
> the technology and the Adoba Brand as an independent operation.
> If [Shiba] chooses not to continue use of the Adoba Brand, he will
> remove all brand material and signage in a reasonable time
> mutually agreed upon. In any event, upon termination of this
> agreement by [Shiba], Atmosphere will receive all current monies
> due in full to date.

Docket 37-3 at 5. Shiba and Karim Merali took over operation of the hotel on

May 1, 2013.

Currently, there are unpaid bills from vendors who serviced the hotel

prior to May 1, 2013. Merali represented to vendors that Atmosphere is

responsible for those debts. Atmosphere disagrees and claims Shiba is the

party responsible for paying the debts.

## DISCUSSION

Atmosphere seeks a preliminary injunction and asks the court to enjoin

defendants in two respects. First, Atmosphere claims defendants are not

entitled to use of the Adoba® brand and processes associated with it and asks

the court to enjoin them from doing so. Second, Atmosphere asks the court to

order defendants to pay all debts owed to vendors which arose from the

operation of the hotel.

"A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant." *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). To determine whether a preliminary injunction is appropriate the court considers the *Dataphase* factors:

(1)  whether the movant is likely to prevail on the merits;

(2)  the threat of irreparable harm to the movant;

(3)  the state of balance between this harm and the injury that granting the injunction will inflict on the other parties litigant; and

(4)  the public interest.

*TCF Nat'l Bank v. Bernanke,* 643 F.3d 1158, 1162 (8th Cir. 2011) (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 733 (8th Cir. 2008); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).

The *Dataphase* test for preliminary injunctive relief is a flexible analysis. *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999). "While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (internal quotations and citations omitted).

## I.    **Adoba® Brand and Processes**

Atmosphere claims defendants should be enjoined from using the Adoba® brand and processes under three theories: fraudulent inducement,

breach of contract, and misappropriation of trade secrets. First, Atmosphere contends defendants fraudulently induced it to enter the Licensing Agreement and the agreement should therefore be rescinded. Second, Atmosphere contends defendants breached, and continue to breach, provisions in the Licensing Agreement and the Management Agreement. Third, Atmosphere contends defendants are misappropriating its trade secrets by continuing to use its trademark and trade secrets. Under these theories, Atmosphere asks the court to enjoin defendants from using the Adoba® brand and processes.

### A.    Likelihood of Success on the Merits

The court begins its analysis by examining Atmosphere's likelihood of success on the merits with respect to its three theories. In determining the likelihood of success on the merits, the litigant bringing the claim need not show that he or she will ultimately win the case, rather, "at the early stage of a preliminary injunction motion, the speculative nature of this particular inquiry militates against any wooden or mathematical application of the test." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998). A court should instead "weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* (internal citations and quotations omitted). "Probability of success on the merits" in this context means that the moving party must show it has "a 'fair chance' of success on the merits[.]" *Planned Parenthood*, 530 F.3d at 731. A

"fair chance of prevailing" does not mean a greater than 50 percent likelihood of prevailing on the merits of the claim. *See id.* at 731 (citing *Dataphase*, 640 F.2d at 113). The burden on the movant is heavy where granting the preliminary injunction will give the movant substantially the relief it would obtain after a trial on the merits. *United Indus. Corp.*, 140 F.3d at 1179.

### 1.   **Fraudulent Inducement**

Atmosphere claims defendants fraudulently induced it to enter into the Licensing Agreement and the Management Agreement. Defendants dispute Atmosphere's allegation and, separately, contend that even if Atmosphere was fraudulently induced, it has since waived that claim because it chose to operate under the agreements for over a year knowing their terms.

"Fraudulent inducement entails willfully deceiving persons to act to their disadvantage."[5] *Law Capital, Inc. v. Kettering*, 836 N.W.2d 642, 646 (S.D. 2013). To establish fraudulent inducement, Atmosphere must prove defendants committed one of the following acts:

> (1) The suggestion as a fact of that which is not true by one who does not believe it to be true;
>
> (2) The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;

---

[5] Based on their briefs and arguments during the hearing, the parties appear to agree that South Dakota law applies in this diversity action. Also, the Licensing Agreement states that it "shall be governed by and interpreted under the laws of the State of South Dakota." Docket 37-1 at 20.

(3) The suppression of that which is true by one having knowledge or belief of the facts;

(4) A promise made without any intention of performing it; or

(5) Any other act fitted to deceive.

SDCL 53-4-5; *see also Poeppel v. Lester*, 827 N.W.2d 580, 587 (S.D. 2013). Atmosphere must also prove defendants' fraudulent behavior induced it to act to its detriment. *Johnson v. Miller*, 818 N.W.2d 804, 808 (S.D. 2012).

"Rescission of a contract is available if the consent of the party seeking rescission was obtained by . . . fraud[.]" *Shedd v. Lamb*, 553 N.W.2d 241, 244 (S.D. 1996). But "[f]ailure of a party to disaffirm a contract over a period of time may ripen into ratification, especially if rescission will result in prejudice to the other party." *Id.* at 244-45. A "party rescinding a contract must rescind promptly, upon discovering the facts which entitle him to rescind[.]" SDCL 53-11-4. The question of whether a rescinding party acted promptly is a question of law. *Shedd*, 553 N.W.2d at 245.

Even assuming Atmosphere can prove defendants fraudulently induced it to enter into the agreements, Atmosphere failed to rescind the agreements promptly. Defendants produced an email sent at 4:59 p.m. on December 31, 2011, in which Karim Merali sent Henderson a copy of the final Licensing Agreement. The email includes a statement from Merali which reads: "Attached is the license Agreement. . . Please review and let me know if ok as per our discussions late last night." This email shows the parties were negotiating the

9

terms of the contract as of December 30, 2011, and also shows Atmosphere

had access to the final version prior to and immediately after signing it.

Moreover, defendants introduced an email sent by Henderson to Merali on

January 8, 2012, discussing the Licensing Agreement and the Management

Agreement. Docket 35-1. In this email, Henderson wrote:

> The management contract as well as the license agreement *we wrote* is really not good. It is basically a 90 day contract and not worth anything to you or Atmosphere. . . . I suggest we write an addendum that omits that 90 day out and we write legitimate reasons why either can terminate, or, write more basic language. *I had to show the agreement* to my insurance company, Lyle and Wells Fargo in order to get insurance, show my lawyer and to open up an operating account with benefits at Wells Fargo, I asked your approval prior to showing any of these parties the other day. In unison, all the parties I just mentioned state the contract is worthless with that 90 day out term for any reason written in the contract.

Docket 35-1 (emphasis added). This email suggests Atmosphere and others,

including its lawyer, reviewed the agreements just days after they were signed.

In light of these emails, Atmosphere was aware of any alleged fraud and needed

to take efforts to rescind the agreements promptly. By not rescinding promptly

and instead receiving benefits under the agreements for well over a year,

Atmosphere ratified the allegedly fraudulently induced agreements through its

actions.

Henderson testified that he had only discussed the ninety-day

termination provision with one of his relatives and that the contents of the

email are not accurate, claiming he did not actually show the contracts to

anyone. Even if the court were to believe Henderson's testimony, Atmosphere still fails to show it is likely to succeed on the merits.

Atmosphere and defendants began discussions about forming a business relationship in which Atmosphere would license its brand and processes associated with the brand to defendants in the spring of 2011. The parties began negotiating the actual language of the two agreements in October or November of 2011 when Atmosphere delivered draft versions of the documents to Merali. The agreements were ultimately signed on December 31, 2011. Prior to signing the agreements, Atmosphere was aware Merali had made significant changes to the documents.[6]

Atmosphere now claims it did not read the agreements in full even though Merali informed them that he had made significant changes to them.[7] The agreements were the culmination of over six months of discussions and negotiations dealing with Henderson's self-described "life's work." It was Atmosphere's responsibility to act diligently and review the contracts before signing them; indeed, it was Atmosphere's legal duty to do so. *See Kernelburner, LLC v. MitchHart Mfg., Inc.*, 765 N.W.2d 740, 743 (S.D. 2009)

---

[6] The parties dispute when Atmosphere became aware of certain changes as well as the extent of the changes. Henderson admits, however, that Merali told him changes were made to the termination provision and the fees provision.

[7] In fact, Atmosphere claims it never read the agreements in full until well into this litigation. This is despite the fact that Henderson signed or initialed every page of both agreements.

11

(noting a contracting party's legal duty is to read a contract before signing it). Atmosphere's failure to read the agreements, especially when considering the self-described importance of such agreements, cannot be used by Atmosphere to rescind the agreements over a year down the road—after benefitting from the same agreements—when the relationship between the parties has soured. "To permit a party . . . to admit that he signed [a contract] but to deny that it expresses the agreement he made or to *allow him to admit that he signed it but did not read it* or know its stipulations would absolutely destroy the value of all contracts." *Kernelburner, LLC*, 765 N.W.2d at 743. Accepting Atmosphere's version of the facts leads only to the conclusion that it neglected its legal duty to read the contracts before signing them.

In sum, Atmosphere either failed to rescind the contracts promptly or neglected its legal duty to read the contracts before signing them. Atmosphere chose to operate under the agreements for over a year and received the benefits of doing so. Thus, Atmosphere effectively ratified the agreements that it now claims it was fraudulently induced to enter. Atmosphere has not shown that it is likely to succeed on the merits of its fraudulent inducement claim.

### 2.   Breach of Contract

Atmosphere also claims defendants breached and continue to breach both the Licensing Agreement and the Management Agreement by continuing to use the Adoba® brand and processes following termination of the agreements. Defendants contend the Licensing Agreement allows them to

continue using the Adoba® brand and processes even after termination of the agreements so long as defendants provided notice of their intentions to do so. The dispute rests on a matter of contract interpretation.

When interpreting a contract, the language the parties used in the contract is determinative of their intention. *Poeppel*, 827 N.W.2d at 584. When the language of a contract provides a plain and unambiguous meaning, construction is not necessary. *All Star Constr. Co. v. Koehn*, 741 N.W.2d 736, 744 (S.D. 2007). But when the contract language provides an ambiguous meaning, the rules of construction are required for interpretation. *Id.* "[A] contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.*

The issue here is whether Shiba can continue using the Adoba® brand and processes following Shiba's termination of the Licensing Agreement and Management Agreement. The court first looks to § 12 of the Licensing Agreement, which details Shiba's obligations upon termination. Section 12 provides:

> *Subject to other provisions herein, including section 3.b*, on termination or expiration of this License Agreement for any reason, [Shiba] shall, at its sole expense, on or before the effective date of termination or expiration:

a. Immediately discontinue all use of the Marks[8] and any word or mark similar to the Marks, and refrain from using the Marks to identify the Hotel. All signage and other identifying equipment that use any of the Marks in any form shall be immediately removed from the interior and exterior of the Hotel. If [Shiba] does not immediately discontinue its use of the Marks, Atmosphere shall be deemed to have suffered irreparable harm and will be entitled to affirmative injunctive and other equitable relief. [Shiba] waives, to the maximum extent permitted by law, any claim that Atmosphere's damages under such circumstances can be adequately remedied by monetary damages alone and any requirement that Atmosphere post any bond for the issuance of any injunction. Should a bond nonetheless be required, [Shiba] agrees that the amount of such bond need not exceed $1,000.00[.]

Docket 37-3 at 13 (emphasis added). Section 12a requires Shiba to discontinue using the Adoba® name immediately upon termination of the Licensing Agreement. But § 12a is explicitly subject to § 3b, which provides:

---

[8]   "Marks" means all of Atmosphere's trademarks and trade names and includes the trademarks set forth on Exhibit B, which is attached to this Agreement and incorporated by this reference, the trade names set forth on Exhibit C, which is attached to this Agreement and incorporated by this reference, and all associated Adoba® URL addresses and other intellectual property owned by Atmosphere and used with the Licensed Concept. The term includes the related all forms of logos, designs, stylized letters, images, and colors that identify or define the brand in all formats, including without limitation on social media or otherwise distributed on-line, that are approved for use with the Licensed Concept from time to time at the Hotel and in advertising for the Hotel. The term includes any other additional or substituted trademarks, trade names, service marks or logos that Atmosphere later adopts and authorizes [Shiba] in writing to use. [Shiba] agrees to operate the Hotel exclusively under the Marks and the trade name "Adoba® Eco Hotel" during the Term (defined below) and the term of the Management Agreement.

Licensing Agreement, § 1n, at Docket 37-3 at 3.

> Notwithstanding the foregoing, [Shiba] or Atmosphere can cancel this contract without cause with 90 days written cancellation at any time, without any penalties. *This clause supersedes any other cancellation or termination clause in this entire agreement.* Due to the nature and circumstances of a deep and long lasting friendship, [Shiba] and Atmosphere both agree that a termination will have significant impact on either party and as such each party should leave the agreement with vested interest. *[Shiba] will keep the technology and the Adoba Brand as an independent operation.* If [Shiba] chooses not to continue use of the Adoba Brand, he will remove all brand material and signage in a reasonable time mutually agreed upon. In any event, upon termination of this agreement by [Shiba], Atmosphere will receive all current monies due in full to date.

Docket 37-3 at 5 (emphasis added). Section 3b, therefore, permits Shiba to keep the "technology and the Adoba Brand," and Shiba is only required to remove all signage and branding if it chooses not to keep the brand. These sections in the Licensing Agreement support defendants' argument that they should be allowed to continue using the Adoba® brand and processes.

Other sections in the Licensing Agreement, however, support Atmosphere's position. Section 2 states, "During the Term[9] and the term of the Management Agreement, Atmosphere grants to [Shiba] the non-exclusive license to use the Licensed Concept, the Manuals, the System, and the Marks in operating the hotel." Docket 37-3 at 4. This languages suggests that the license would expire upon termination of the Licensing Agreement or Management Agreement. Moreover, § 8a of the Licensing Agreement states:

---

[9] " 'Term' means the period of time [the] Licensing Agreement is in effect[.]" Licensing Agreement, § 1w, at Docket 37-3 at 4.

> [Shiba] acknowledges and agrees that the Licensed Concept,
> including the Manuals, the Marks, the System, and the Rules and
> Regulations are the sole property of Atmosphere and agrees not to
> claim any interest therein except to the extent provided to the
> Hotel based on specifically on (sic) this License
> Agreement. . . . [Shiba] understands and agrees that: the Licensed
> Concept, the Manuals, the System, and the Marks *are and will
> remain the sole and exclusive property of Atmosphere*; . . . [Shiba]
> will immediately assign to Atmosphere upon its request any rights
> to the Licensed Concept, the Manuals, the System, or the Marks
> that [Shiba] may gain through its ownership of the Hotel.

Docket 37-3 at 8 (emphasis added). Section 8a provides that the Adoba® brand

is and will remain the "sole and exclusive property of Atmosphere," thereby

conflicting with the notion that defendants can continue using it after

termination of the agreements. Recital C of the Licensing Agreement also gives

credence to Atmosphere's position. Recital C states, "Atmosphere's agreement

to grant a license to the Licensed Concept for the Property is expressly

conditioned upon . . . Atmosphere's operation and management of the Hotel."

Docket 37-3 at 1. This language suggests defendants can no longer use the

Adoba® brand or processes if Atmosphere is not operating and managing the

hotel. Therefore, the Licensing Agreement includes language that supports

Atmosphere's argument that defendants are no longer entitled to use the

Adoba® name or processes.

Atmosphere also directs the court to the Management Agreement in

support of its position. While it is rather unlikely that the parties intended that

the Management Agreement control the grant of the license, the court examines

the language in the Management Agreement nonetheless. *See Kramer v.*

16

*William F. Murphy Self-Declaration of Trust*, 816 N.W.2d 813, 815 (2012)

(providing that when two writings are executed together as part of a single

transaction they should be interpreted together).

Atmosphere emphasizes two parts of the Management Agreement: Recital

F and § 2.04. Recital F provides:

> Atmosphere's agreement to grant a license to the Licensed Concept
> for the Property is expressly conditioned upon Atmosphere's
> approval of the use and application of the Licensed Concept in the
> renovation of the Hotel and Atmosphere's continuous operation
> and management of the Hotel. Accordingly, Atmosphere's
> agreement to enter this Agreement is conditioned upon [Shiba's]
> concurrent execution and delivery of this Agreement and the
> License Agreement.

Docket 1-2 at 2. Section 2.04 states, "[Shiba] agrees that the Property shall be

part of the Adoba® Hotels System as defined in the License Agreement to the

full to the (sic) extent reasonably possible and permitted by [Shiba]." Docket 1-

2 at 4. Because Recital F essentially mimics Recital C of the Licensing

Agreement, Recital F conveys the same intention—that defendants can no

longer use the Adoba® brand or processes if Atmosphere is not operating and

managing the hotel. Section 2.04 simply notes that the Licensing Agreement

defines the license relationship. In sum, the Management Agreement does not

provide clarity as to whether defendants can continue using the Adoba® brand

and processes.

After reviewing the entirety of the Licensing Agreement and the

Management Agreement, the court finds the language allows for two conflicting

17

outcomes. Some language in the agreements supports defendants' position (that it should be allowed to continue using the Adoba® brand and processes); other language supports Atmosphere's position (that upon termination of the agreements, defendants must cease using the Adoba® brand and processes). Because the agreements are capable of more than one meaning, they are ambiguous. *All Star Constr. Co.*, 741 N.W.2d at 744.

Because the agreements are ambiguous, parol evidence may be introduced to determine the intent of the parties. *Pankratz v. Hoff*, 806 N.W.2d 231, 237 (S.D. 2011). The parties testified at length during the hearing regarding Atmosphere's fraudulent inducement claim.[10] But little was said regarding the parties' intentions when entering into the agreements, and therefore, neither party made a strong showing as to the meaning of the agreements.

Atmosphere contends that the custom in the industry is that the licensee ceases using the licensed brand following termination of a licensing agreement. While this argument has some weight, the circumstances here were not typical because the hotel was the first Adoba® hotel. Merali testified about the risks that he faced by entering into a licensing agreement in which his hotel would operate under an entirely new brand as opposed to an older, more established

---

[10] Merali testified on behalf of Shiba, and James Henderson and Adrienne Pumphrey testified on behalf of Atmosphere.

hotel brand. Thus, the industry custom is not as determinative here as it may be in other circumstances.

Overall, Atmosphere has not put forth convincing parol evidence to show that the parties intended that defendants must cease using the Adoba® brand and processes upon termination of the agreements. As a result, Atmosphere has not met its burden of showing that it is likely to succeed on the merits of its breach of contract claim.

### 3.    Misappropriation of Trade Secrets

Atmosphere also claims it is entitled to relief under a misappropriation of trade secrets theory. The problem with this theory, however, lies in the court's analysis above. Because Atmosphere failed to show a likelihood of success on its breach of contract claim, the court assumes defendants are entitled to "keep the technology and Adoba Brand" for purposes of this section. Atmosphere has not clearly articulated what trade secrets are separate and distinct from the "technology and Adoba Brand" such that defendants are not entitled to continue operating the motel as they currently are. Therefore, Atmosphere failed to meet its burden under its misappropriation of trade secrets theory as well.

In sum, Atmosphere has not shown that it has a likelihood of succeeding on any of its three theories. The court will nevertheless analyze the remaining three *Dataphase* factors.

**B.**     **Threat of Irreparable Harm to Atmosphere Absent a Preliminary Injunction**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Atmosphere must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Atmosphere alleges it is suffering irreparable harm because it may be hampered when it attempts to attract future franchisees. Atmosphere also alleges that defendants are diluting the value of the Adoba® brand by not meeting Adoba® standards and that there is a risk of consumer confusion.

Atmosphere did not put forth substantial evidence that defendants' conduct has hampered Atmosphere's ability to attract other franchisees. In fact, Henderson testified that they were in the process of franchising a new hotel in Texas. Atmosphere's alleged harm to their future prospects, at this point, is speculative as opposed to *likely*.

In contrast, Atmosphere put forth evidence that customers are complaining about their experiences at the Rapid City Adoba® hotel, which suggests brand dilution and injury to reputation and goodwill. "Injury to reputation or goodwill is not easily measurable in monetary terms and so often is viewed as irreparable." 11A Charles Alan Wright & Arthur R. Miller, *Federal*

*Practice and Procedure* § 2948.1 at 159 (3d ed. 2008). A loss of goodwill, by itself, may not always be enough to establish irreparable harm. *Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 790 (8th Cir. 2010). The circumstances here may present such a case. It is in defendants' best interest to operate the hotel at a high level, otherwise profits will tumble. Accordingly, defendants have the incentive to maximize the value of the Adoba® brand. Thus, Atmosphere's complaint of injury to goodwill and brand dilution is somewhat offset by defendants' position.

Lastly, Atmosphere failed to put forth evidence that customer confusion is occurring or likely to occur. There are no Adoba® hotels in the surrounding area. The only other operating Adoba® hotel is in Dearborn, Michigan. Atmosphere's allegation at this point is mere speculation.

While Atmosphere's complaint of injury to its goodwill and brand dilution is a valid one, it has not put forth enough evidence at this time to warrant a preliminary injunction on that basis alone, especially in light of its failure to show a likelihood of success on the merits.

## C.   Balance of Harms

Atmosphere claims defendants' harm, in the event the preliminary injunction is granted, would be slight. The court disagrees. Merali testified that changing the name of the hotel would cost a substantial amount of time and money. Atmosphere itself put forth substantial evidence regarding how costly and difficult it is to change a hotel brand. Henderson testified at great lengths

21

about the time, resources, and expense that went into changing the hotel from a Radisson to an Adoba®. For Atmosphere to now claim that "Shiba can easily change the name of the hotel to 'Shiba Hotel' or anything else" is disingenuous. Because defendants' harm is certain and significant while the majority of Atmosphere's harm is speculative, this factor weighs in favor of defendants.

### D.    Public Interest

The public interest factor provides little assistance here. The public has an interest in protecting intellectual property rights. The public also has an interest in parties performing under the terms of the contracts to which they enter. Certainly, an entity can contract away its intellectual property rights. Because the public interest determination depends on the interpretation of the agreements, Atmosphere's failure to show a likelihood of success on the merits causes this factor to weigh in defendants' favor.

Atmosphere failed to show that it was likely to succeed on any of its claims. And although Atmosphere's claim of irreparable harm to its goodwill and brand is a valid one, the circumstances here are not such that the irreparable harm factor, standing alone and in light of Atmosphere's inability to show a likelihood of success, warrants a preliminary injunction. For these reasons, defendants may continue operating the hotel using the Adoba® brand and processes while this action is pending.

### II.    Debts to Vendors

Atmosphere also asks the court to order defendants to pay all debts owed to vendors that arose from operations at the hotel. Atmosphere contends that

22

Shiba is telling vendors that it is not responsible for the debts, thereby ruining Atmosphere's credit worthiness, reputation, and good name. Although not entirely clear, defendants seem to argue Atmosphere is responsible for the debts because Atmosphere allegedly embezzled over $300,000 while it was managing the hotel.

The court begins its analysis with the Management Agreement. Under the Management Agreement, Shiba is responsible for debts incurred in the operation of the hotel. This is because all operating expenses were to be paid with funds from accounts in which Shiba was responsible to fund. Section 2.02 of the Management Agreement provides: "[Shiba] shall deposit in the Operating Account $200,000, which amount shall be replenished or increased by [Shiba] as necessary to pay Operating Expenses, Management Fees, and insurance premiums to the extent cash generated by the Property is insufficient." Docket 1-2 at 3. Operating Expenses are defined in § 2.11 as "all the costs and expenses of operating, managing, and maintaining the Property as required herein including without limitation payroll and related taxes and insurance." Docket 1-2 at 5. Furthermore, § 6.02 states, "All debts, obligations, and other liabilities incurred by the Property through the actions of Atmosphere in the performance of its duties shall be incurred on behalf of [Shiba] and Atmosphere shall not be liable for payment thereof." Docket 1-2 at 12. The Management Agreement unambiguously states that Shiba is responsible for paying all debts incurred in the operation of the hotel.

23

If Atmosphere embezzled money while managing the hotel, Shiba may be entitled to recover a judgment against Atmosphere. But the embezzlement issue does not control who is responsible for paying the vendors. Moreover, defendants have not conclusively shown that Atmosphere did in fact embezzle money. Therefore, it is appropriate for the court to enjoin Shiba from informing vendors that Atmosphere is responsible for the debts at issue, and Shiba is directed to promptly pay the debts owed to vendors that arose from operating the hotel.

## CONCLUSION

Atmosphere has not put forth sufficient evidence to meet its burden to show that defendants should be enjoined from using the Adoba® brand and processes associated with the brand while this action is pending. Separately, the Management Agreement unambiguously states that Shiba is responsible for paying all debts owed to vendors incurred in the operation of the hotel. Accordingly, it is

ORDERED that Atmosphere's motion for preliminary injunction is granted in part and denied in part.

IT IS FURTHER ORDERED that defendants can continue operating the hotel using the Adoba® brand and processes while this action is pending.

IT IS FURTHER ORDERED that defendant Shiba Investments, Inc. must pay all debts owed to vendors that were incurred in the operation of the hotel

and must refrain from informing vendors that Atmosphere is responsible to pay these debts.

IT IS FURTHER ORDERED that Atmosphere is not required to post a security bond consistent with the terms of § 12a of the Licensing Agreement.

Dated December 18, 2013.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE