UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| ATMOSPHERE HOSPITALITY MANAGEMENT, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> SHIBA INVESTMENTS, INC., KARIM MERALI, and ZELJKA CURTULLO, <br><br> Defendants. | 5:13-CV-05040-KES <br><br><br> MEMORANDUM OPINION AND ORDER |

Plaintiff, Atmosphere Hospitality Management, LLC, moves for an order excluding settlement negotiations. Docket 228. Atmosphere also moves for summary judgment on several breach of contract theories against defendants, Shiba Investments, Inc., Karim Merali, and Zeljka Curtullo. Docket 217. In conjunction with Atmosphere's motion for summary judgment, Atmosphere moves the court to deem certain facts as admitted. Docket 243. Defendants resist Atmosphere's motions. Defendants move for partial summary judgment on the issue of whether rescission is available to Atmosphere. Docket 210. Atmosphere resists defendants' motion.

## BACKGROUND

Atmosphere is a Delaware Limited Liability Company with its principal place of business in Colorado. James Henderson and Adrienne Pumphrey have been managing partners of Atmosphere at all times relevant to this litigation.

Shiba is a Texas corporation with its principal place of business in Rapid City, South Dakota. The ownership structure of Shiba includes Karim Merali and his son Sacha Merali. Curtullo is a former employee of Atmosphere.

Atmosphere brought this action against Shiba and Karim to resolve issues related to a licensing contract and management contract between the parties.[1] The agreements enabled Shiba to operate a hotel in Rapid City, South Dakota, that it owns under Atmosphere's brand name, "Adoba," and gave management of the hotel to Atmosphere. This litigation began in 2013 after defendants terminated both agreements.

Atmosphere alleges, among other claims, that defendants have breached the parties' agreements, tortuously interfered with Atmosphere's business expectancies, fraudulently induced Atmosphere to enter the agreements, and misappropriated Atmosphere's trade secrets. Docket 37. Because this matter is now over two years old and numerous pre-trial motions, discovery disputes, and other matters have since come before this court, additional factual matters will be set forth below as those facts pertain to the parties' pending motions.

## I.   Atmosphere's Motion to Exclude Settlement Negotiations

### BACKGROUND

Defendants reference several communications between the parties' attorneys in support of their motion for partial summary judgment and in resistance to Atmosphere's motion for summary judgment. Atmosphere

---

[1]     Curtullo was added as a defendant after Atmosphere was given leave to amend its complaint. *See* Docket 37.

contends that these communications are inadmissible settlement negotiations pursuant to Federal Rule of Evidence 408.

The first contested document is a letter written by Atmosphere's counsel to Karim. Docket 213-4 (Exhibit D).[2] It is dated March 27, 2013, approximately two months before Atmosphere filed its original complaint. *See* Docket 1. Exhibit D accuses Karim of violating several provisions of the property management agreement. For example, the letter states that Karim is interfering with hotel employees in contravention of §§ 1.03 and 2.05 of the agreement. Docket 213-4 at 1. The letter explains that "if you persist in such conduct, Atmosphere will pursue all legal remedies necessary including, without limitation, pursuit of a restraining order if necessary." *Id.* at 2.

The second contested document is comprised of two communications: an email sent on March 29, 2013, from defendants' counsel to Atmosphere's counsel in response to the Exhibit D letter, and a subsequent reply also sent on March 29, 2013, from Atmosphere's counsel. Docket 213-5 (Exhibit E). Defendants' response addresses "the current dispute/disagreement which has arisen between Karim Merali and Jim Henderson and with the hopes of resolving the same." *Id.* at 1. The bulk of the Exhibit E email explains the basis for recent contacts between Karim and representatives of Radisson, although it denies that Karim disclosed any of Atmosphere's proprietary information to

---

[2] "Exhibit D" refers to the exhibit label placed on the document. Rather than refer to the docket entries, the court will refer to the exhibit by its label.

Radisson.[3] It states that the Radisson representatives and Karim were pursuing their own settlement negotiations to resolve a lawsuit between Radisson and Karim. Additionally, the email states that "it appears that Karim will be paying them something" and that two proposals are being investigated to potentially satisfy that obligation. Under the first proposal, Radisson would be allowed to take over management of the hotel for a period of time until it was able to generate money sufficient to satisfy the settlement. The second proposal would involve a tri-party agreement between Radisson, Shiba, and Atmosphere. More specifically, Radisson would be assigned some of the hotel profits which Atmosphere would agree to pay and that Karim would personally guarantee.

According to the email, "[t]his is where the current issues [between Atmosphere and Karim] have arisen. In order for Karim/Shiba to entertain the second proposal, they need assurance that the Hotel will generate income sufficient to pay Radisson and to provide Karim with money to meet his obligations." *Id.* The email then discusses a bill that was recently sent from Atmosphere that allegedly contained "fees that are contrary to the agreement of the parties." *Id.* The email provides several justifications to support its assertion and requested an accounting of all books, records, and accounts of the hotel. *Id.* at 2. It states:

> In order to avoid needless legal expense, I think it would be best if all involved simply laid their cards on the table and allowed an open inspection of the books and accounts and arrive at a clear

---

[3] Prior to becoming an Adoba® hotel, the Rapid City property was operated as a Radisson hotel.

> understanding of what is or is not an appropriate expense or
> charge. From there the [sic] should be easily able to agree on what
> would be due and owing under the Agreements.

*Id.* The email concludes with a request for a meeting between Karim,

Henderson, and the parties' attorneys. Atmosphere's reply to this email

consists of a thank-you and an agreement to meet. *Id.* at 1.

The third document is an email sent on April 3, 2013, from Atmosphere's

counsel to defendants' counsel. Docket 213-6 (Exhibit F). It is a summary of

the discussions that took place following the parties' meeting. Exhibit F

contains eight bullet points. For example, the parties agreed that "Jim will

make available to Karim all bank statements, including checks, on a monthly

basis[.]" *Id.* at 1. Additionally, "Karim and his agents will refrain from

communicating with Atmosphere employees." *Id.* Regarding the bill referenced

in the Exhibit E email, the parties were able to resolve whether some of the

amounts were due. Also, Henderson agreed to deposit $62,000 into the hotel

operating account for "immediate payroll needs" and the parties discussed that

Karim would need to "fulfill his obligations under the PMA" and "make sure

there is a balance of $200,000 in the operating account." *Id.*

The fourth document is an email sent on April 6, 2013, from Henderson

to Karim. Docket 213-7 (Exhibit G). It contains "the adjusted management fee

invoice per our discussions on Monday." *Id.* at 1. The invoice listed three

separate fees totaling $118,221.00 purportedly due from Shiba. *Id.* at 2.

The fifth document is a letter sent on May 17, 2013, from Atmosphere's

counsel to defendants' counsel. Docket 237-1 (Exhibit A). Atmosphere's

5

counsel stated that he was "in receipt of the lawsuit you recently filed against Adrienne Pumphrey, Jade Walton, and Anthony Noon" and that his "firm will be representing these individuals[.]" *Id.* at 1. Additionally, counsel acknowledged that "the right to use the Adoba name is currently in dispute" but that "Atmosphere is willing to allow Shiba Investments to use it for the Rapid City hotel only." *Id.* The letter explained that Atmosphere "will monitor the utilization of the name and will protect its proprietary interest if the use is harmful to the intellectual property associated with the Adoba name" but also that Atmosphere "will assist where necessary to indicate its assent to Shiba Investment's use of the name" if Shiba "desire[d] to work with vendors to utilize the Adoba name[.]" *Id.* Atmosphere's complaint was filed in this case three days later. Docket 1.

## DISCUSSION

Rule 408 governs the admissibility of compromise offers and negotiations. The rule provides in part that:

> Evidence of the following is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> > (1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and
> >
> > (2) conduct or a statement made during compromise negotiations about the claim--except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

6

Fed. R. Evid. 408(a). Such evidence may be admissible, however, "for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Fed R. Evid. 408(b). The purpose of the rule is the "promotion of the public policy favoring the compromise and settlement of disputes." Fed. R. Evid. 408 (advisory committee's note to 1972 proposed rule). It is concerned with "excluding proof of compromise to show liability of [an] offeror." *Crues v. KFC Corp.*, 768 F.2d 230, 233-34 (8th Cir. 1985) (citing *McCormick on Evidence* § 264, at 712 (E. Cleary 3d ed. 1984)). "The policy concerns underlying Rule 408 are strongly implicated where an offer of compromise is used to prove an element of the claim the compromise offer was meant to settle." *Weems v. Tyson Foods, Inc.*, 665 F.3d 959, 966-67 (8th Cir. 2011).

The Eighth Circuit has traditionally "viewed the scope of Rule 408 narrowly." *Dahlgren v. First Nat'l Bank of Holdrege*, 533 F.3d 681, 699 (8th Cir. 2008) (citing *Vulcan Hart Corp. v. NLRB*, 718 F.2d 269, 276-77 (8th Cir. 1983)). But in *E.E.O.C. v. UMB Bank Fin. Corp.*, 558 F.3d 784, 791 (8th Cir. 2009), the court noted that the "spirit of the rule" supported a construction of Rule 408 that is "sufficiently broad to encompass certain material in addition to actual offers of settlement." And in *Weems*, 665 F.3d at 965, the court quoted with approval the Tenth Circuit's holding in *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364 (10th Cir. 1987), which held that "when the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers."

7

Also in *Weems, id.*, the Eighth Circuit expounded on the appropriate test to determine whether a party's proffered evidence falls within the ambit of Rule 408. First, the evidence must be "an offer of compromise within the meaning of Rule 408." *Id.* at 965 (citing *Swan v. Interstate Brands Corp.*, 333 F.3d 863, 864 (8th Cir. 2003)). Such evidence includes "honest attempts to settle controverted claims without resorting to expensive and time consuming litigation." *Bradbury*, 815 F.2d at 1363. Second, to be excludable under Rule 408(a), the compromise evidence must "relate[] to a claim that was in dispute as to validity or amount at the time the [evidence] was proffered." *Weems*, 665 F.3d at 965. The definition of a "claim" for Rule 408 purposes is not a literalism that turns on what a party may have pleaded but is "fact-specific, and tethered to the rationales underlying the rule." *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 298 (5th Cir. 2010). Thus,

> it seems preferable to make the meaning of "claim" turn on whether the result of the interpretation is likely to discourage parties from entering into compromise negotiations and whether the exclusion of the evidence of compromise would be fair in the case before the court.

23 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure, Federal Rules of Evidence* § 5306 (1st ed.) (hereinafter Wright & Miller). And a dispute concerning the claim "need not 'crystallize to the point of threatened litigation' for the 408 exclusion rule to apply." *Id.* (quoting *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 527 (3d Cir. 1995)). Rather, "[a] dispute exists for Rule 408 purposes so long as there is 'an actual dispute or difference of opinion' regarding a party's liability for or the amount of the claim." *Id.*

8

(quoting *id*.). Finally, and although subject to Rule 403, if the compromise evidence is "offered for another purpose, i.e., for a purpose other than to prove or disprove the validity of the claims that the offers were meant to settle," then the evidence is admissible under Rule 408(b). *Id.* at 966 (quotation omitted).

### A.   Are the communications an offer or offers of compromise within the meaning of Rule 408?

The court's first inquiry is to determine if any of the communications are offers to compromise within the meaning of Rule 408. Exhibit D sets out several of Atmosphere's pre-lawsuit factual and legal grievances as well as its demands. Such letters are generally not "compromise negotiations" within the meaning of Rule 408. *See, e.g., Ullmann v. Olwine, Connelly, Chase, O'Donnell & Weyher*, 123 F.R.D. 237, 242 (S.D. Ohio 1987) (finding letters consisting of factual positions, legal demands, and threats of litigation are not "compromise negotiations" within the meaning of Rule 408); *Sunstar, Inc. v. Alberto–Culver Co., Inc.*, Nos. 01-C-0736 and 01-C-5285, 2004 WL 1899927, at *22 (N.D. Ill. Aug. 23, 2004) (admitting letters setting forth parties' factual positions, asserting legal claims, and making legal demands because the letters "fail to contain any suggestion of compromise"); *see also Atronic Int'l., GmbH v. SAI Semispecialists of Am., Inc.*, No. 03–CV–4892, 2006 WL 2654827, at *7 n. 4 (E.D.N.Y. Sept. 15, 2006) ("Where a letter provides solely demands and lacks any suggestion of compromise, such a document would not be excludable by Rule 408."); *but see Kritikos v. Palmer Johnson, Inc.*, 821 F.2d 418, 423 (7th Cir. 1987) (letters subject to exclusion under Rule 408 because they were

written "with the objective of advising the plaintiff of [a] possible compromise solution before legal action was commenced" and they detailed a specific compromise solution for the plaintiff to consider in an attempt to reconcile the differences between the parties). The court finds that Exhibit D is not an offer of compromise and therefore is not excludable pursuant to Rule 408.

As for Exhibits E and F, however, the court concludes that these communications are offers of compromise within the meaning of Rule 408. *See Freidus v. First Nat'l Bank of Council Bluffs*, 928 F.2d 793, 795 (8th Cir. 1991) (observing that it is permissible to read several exhibits together to determine whether they fall within Rule 408). Exhibit E provides defendants' counter arguments to Atmosphere's assertions that appeared in Exhibit D and suggests that the parties meet in order to determine whether certain billed amounts are owed short of resorting to litigation. Specifically, it notes that the purpose of such a meeting is to "avoid needless legal expense" and that the parties "should be easily able to agree on what would be due and owing under the Agreements." Docket 213-5 at 2; *cf. Bradbury*, 815 F.2d at 1363. Exhibit F is a summary of that meeting and details the parties' compromises. Those compromises include the resolution of several of Atmosphere's contentions in the Exhibit D letter and also several of defendants' counter arguments in the Exhibit E email. Some issues, however, required additional time to investigate or implement, such as whether property taxes were paid by the correct party and Karim's need to ensure that a balance of $200,000 was maintained in the hotel operating account. Nonetheless, these communications describe the give-

10

and-take that the parties made in order to reconcile their disputes short of resorting to litigation. Thus, they are offers of compromise within the meaning of Rule 408.

Exhibit G is similar to Exhibit D insofar as it includes a demand for payment in the form of a bill or invoice. Generally, bills that set forth an amount the sender believes the recipient owes are not offers of settlement. *Winchester Packaging, Inc. v. Mobil Chem. Co.*, 14 F.3d 316, 319 (7th Cir. 1994). But this letter also explains that it is sent "per our discussions on Monday," referencing the meeting summarized by Exhibit F. Docket 213-7. According to Exhibit F, the original bill was for approximately $180,000, of which roughly $93,000 was not disputed. Docket 213-6 at 1. Karim disputed whether a $20,000 application fee had already been paid, but Atmosphere agreed that two fees totaling $49,000 were not justified. *Id.* The parties further agreed that $18,000 worth of accounting fees would be revisited. *Id.* The revised bill in Exhibit G contains the same $93,000 charge that was not disputed, but also contains the disputed $20,000 fee and a revised accounting fee of $4,800. Docket 213-7 at 2. In this light, the bill in Exhibit G can be interpreted as a compromised amount that Atmosphere was willing to accept to resolve the parties' dispute short of litigation. *Winchester*, 14 F.3d at 320 (explaining that "it would make sense for Winchester in submitting a bill to Mobil in an atmosphere in which the threat of a lawsuit was looming to offer an inducement that would avoid the necessity of 'incur[ring] any additional legal

costs.' ") (alteration in original). Thus, Exhibit G is also an offer of compromise within the meaning of Rule 408.

Exhibit A is contested for the first time in Atmosphere's reply brief because the exhibit was not docketed by defendants until after Atmosphere filed the present motion. Although the letter references an ancillary lawsuit, it also contains a means of resolving a matter of contention between the parties. Docket 237-1. Specifically, the letter references the fact that the proper use of the Adoba® name is being disputed. Nonetheless, Atmosphere was willing to assent to defendants' use of the Adoba® name under certain circumstances and that Atmosphere would continue to monitor that use. Thus, the court finds that Atmosphere's conditional assent to the use of the Adoba® name short of litigation is also an offer of compromise within Rule 408.

### B. Whether Exhibits E, F, G, and A relate to a claim that was in dispute at the time the communications were made?

The second inquiry is whether the offers of compromise are excludable under Rule 408(a). This inquiry that turns on whether the communications related to a claim that was disputed at the time the communications were made. Exhibit E specifically refers to amounts that Atmosphere claimed were due under the parties' signed agreements and that defendants disputed, such as the $20,000 licensing application fee, the $18,000 in accounting fees, and several other fees. Exhibit F acknowledges that the parties were able to come to an agreement regarding several of Atmosphere's claims, but noted that Karim still disputed that the $20,000 licensing application fee was due and that the amount of the accounting fees would need to be revised. Those differences

12

reflect " 'an actual dispute or difference of opinion' regarding a party's liability for or the amount of the claim." *Weems*, 665 F.3d at 965; *see also Affiliated Mfrs.*, 56 F.3d at 527 ("The district court properly interpreted the scope of the term 'dispute' to include a clear difference of opinion between the parties here concerning payment of two invoices."). It also details several disputes that the parties had yet to satisfy, such as Karim's agreement to refrain from communicating with Atmosphere personnel, Henderson's agreement to deposit $62,000 into the hotel operating account, and the need for Karim to keep that account funded with at least $200,000. The bill in Exhibit G was sent three days after the Exhibit F email was sent and includes a demand for the disputed $20,000 licensing application fee and Atmosphere's revised accounting fees. Defendants have presented no evidence to suggest that those amounts were free from dispute at the time the bill was sent. Thus, Exhibits E, F, and G are communications related to claims that were disputed at the time the communications were made and are therefore excludable under Rule 408(a).

Likewise, the letter in Exhibit A relates to a claim that was disputed at the time the letter was sent. That dispute concerns the use of the Adoba® name. While Atmosphere agreed to allow defendants to continue using the name in spite of that dispute, Atmosphere's acquiescence is conditional. Moreover, Atmosphere informed defendants that it would monitor their usage of the Adoba® name and that Atmosphere would intervene to protect its interests if needed. Thus, the permissible use and scope of the use of the

Adoba® name was disputed at the time this letter was sent. The court

concludes Exhibit A is also excludable under Rule 408(a).

### C.    Whether the excludable communications are nonetheless admissible under Rule 408(b)?

Because the court has determined that Exhibits E, F, G, and A are

excludable under Rule 408(a), the court must next determine if those

documents are nonetheless admissible under Rule 408(b). The answer to that

question depends on the purpose for which the documents are offered. *Cf.*

*Athey v. Farmers Ins. Exch.*, 234 F.3d 357, 362 (8th Cir. 2000) (holding that an

insurer's conduct during settlement negotiations may be offered to demonstrate

its bad faith and therefore the evidence was "offered for another purpose"

under Rule 408(b)).

Defendants contend that they are offering Exhibits E, F, and G to

demonstrate when Atmosphere had knowledge of certain facts pertaining to the

terms of the parties' agreements. Defendants contend that proof of

Atmosphere's knowledge of the terms of the parties' agreements will preclude

Atmosphere from electing the remedy of rescission.

Rescission of a contract is an available remedy "if the consent of the

party seeking rescission was obtained by . . . fraud[.]" *Shedd v. Lamb*, 533

N.W.2d 241, 244 (S.D. 1996) (citing SDCL 53-11-2(1) and (2)). Among other

claims, Atmosphere asserts that defendants fraudulently induced it to enter

the licensing agreement by either concealing or misrepresenting the extent of

numerous alterations to the parties' agreement that were made by Karim.

Docket 37 at 27-28. "Fraudulent inducement entails willfully deceiving persons

14

to act to their disadvantage." *Law Capital, Inc. v. Kettering*, 836 N.W.2d 642, 646 (S.D. 2013). To establish fraud, Atmosphere must prove defendants committed one of the following acts:

    (1)    The suggestion as a fact of that which is not true by one who does not believe it to be true;

    (2)    The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;

    (3)    The suppression of that which is true by one having knowledge or belief of the facts;

    (4)    A promise made without any intention of performing it; or

    (5)    Any other act fitted to deceive.

SDCL 53–4–5; *see also Poeppel v. Lester*, 827 N.W.2d 580, 587 (S.D. 2013). Atmosphere must also prove defendants' fraudulent behavior induced it to act to its detriment. *Johnson v. Miller*, 818 N.W.2d 804, 808 (S.D. 2012).

But even if Atmosphere was entitled to rescission because of defendants' fraud, Atmosphere "may ratify the contract by [its] actions." *Shedd*, 533 N.W.2d at 244. The "[f]ailure of a party to disaffirm a contract over a period of time may ripen into ratification, especially if rescission will result in prejudice to the other party." *Id.* at 244-45 (citing *First State Bank of Sinai v. Hyland*, 399 N.W.2d 894, 898 (S.D. 1987)). Therefore, "[t]he party seeking rescission must do so promptly upon discovery of the facts which entitle them to rescind." *Id.* at 245 (citing SDCL 53-11-4).[4]

---

[4] Whether the rescinding party has acted promptly is a question of law. *Shedd v. Lamb*, 553 N.W.2d 241, 245 (S.D. 1996)).

15

There is some authority for the proposition that offers of compromise are not admissible under Rule 408 when the purpose for using such evidence is to defeat a party's remedy. In *Caterpillar Inc. v. Sturman Indus., Inc.*, No. 99-CV-1201, 2006 WL 452597 at *3 (C.D. Ill. Feb. 22, 2006), the district court explained that:

> While Rule 408 may not prohibit the introduction of evidence relating to settlement negotiations when offered for some purpose other than establishing liability, the Court finds that it would be bad public policy to allow evidence of prior settlement negotiations to be used in the way that [the defendants] are attempting to use it here, that is as a shield to avoid the imposition of a remedy flowing from a breach of contract.

The court also explained that a contrary rule would discourage settlement negotiations "if doing so would result in the inability to assert [a party's] full rights" during trial if the dispute could not be resolved through those negotiations. *Id.* And in *Abundis v. United States*, 15 Cl. Ct. 619, 621 (Ct. Cl. 1988), the court excluded settlement discussions that were "relate[d] directly . . . to remedy." Thus, Rule 408 not only excludes offers of compromise used to disprove the validity of a claim but also excludes the same evidence used to disprove the availability of a remedy for a claim.

Defendants also contend that Exhibits E, F, and G are admissible to show that Atmosphere was not induced to enter the agreements by defendants' representations. Defendants' email in Exhibit E references that several changes were made to the fees and termination provisions of the agreements. Exhibit F also refers to some of the requirements of the termination provisions in the property management agreement. According to defendants, Atmosphere's

16

citation to those provisions shows that Atmosphere knew that changes had been made to those provisions when it signed the agreements and that the changes did not concern Atmosphere until litigation began. If Atmosphere was aware when it signed the agreements that material alterations had been made to them, Atmosphere cannot later argue that it was induced to enter into the agreements due to defendants' fraudulent representations. *Cf. Windedahl v. Harris*, 156 N.W. 489, 490 (S.D. 1916) (holding that "no matter what representations were made" regarding the condition of land for sale, if the party alleging fraud had knowledge of the conditions of the land then "they could not demand rescission on account of any misrepresentations as to such surface conditions."); *First State Bank v. Gunderson*, 223 N.W. 596, 600 (S.D. 1929) ("If respondent, at the time of executing the renewal note sued on, had knowledge of the alleged fraud practice upon him in inducing him to give such original notes, he could not now argue such fraud as a defense to the note sued upon."). But using these exhibits for the purpose of disputing the validity of a party's claim goes to the heart of the exclusionary rationale of Rule 408. *See Weems*, 665 F.3d at 966-67. Thus, the court concludes that Exhibits E, F, and G are inadmissible to defeat Atmosphere's fraudulent inducement claim as well as its potential remedy of rescission for that claim.

Similarly, defendants' cite Exhibit A in response to Atmosphere's motion for summary judgment to argue that defendants received written permission to continue using the Adoba® name and therefore defendants did not breach the parties' licensing agreement. Docket 235 at 11. Defendants' use of Exhibit A to

dispute the validity of Atmosphere's breach of contract claim is not a permissible use of an offer of compromise under Rule 408. Thus, Exhibit A is inadmissible for that purpose.

## II.   The Parties' Motions For Summary Judgment

### LEGAL STANDARD

Summary judgment on all or part of a claim is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Craig*, 144 F.3d 593, 595 (8th Cir. 1998). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)); *see also* Fed. R. Civ. P. 56(e). "Further, 'the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, the dispute must be outcome determinative under prevailing law.' " *Id.* (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)). The facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for

summary judgment. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

In addition to the Federal Rules of Civil Procedure, this court has adopted local rules in civil cases that are binding on the parties. *Braxton v. Bi-State Dev. Agency*, 728 F.2d 1105, 1107 (8th Cir. 1984) ("Rules of practice adopted by United States District Courts have the force and effect of law."). Local Rule 56.1 is the local rule governing motions for summary judgment. When a party moves for summary judgment, the moving party is required to support its motion with "a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." D.S.D. Civ. L.R. 56.1(A). A party's statement of material facts (SMF) must be separated into paragraphs by number and must contain "an appropriate citation to the record in the case." *Id.* The party opposing the summary judgment motion must respond to each assertion in the moving party's SMF "with a separately numbered response and appropriate citations to the record." D.S.D. Civ. L.R. 56.1(B). The opposing party must also "identify any material facts as to which it is contended that there exists a genuine material issue to be tried." *Id.* But "[a]ll material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's statement of material facts." D.S.D. Civ. L.R. 56.1(D).

The purpose of local rules like Local Rule 56.1(A) and (B) "is to distill to a manageable volume the matters that must be reviewed by a court undertaking

to decide whether a genuine issue of fact exists for trial. [They are] designed 'to prevent a district court from engaging in the proverbial search for a needle in the haystack.' " *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990 (8th Cir. 2006) (discussing W.D. Mo. L.R. 56.1(a)) (quoting *Nw. Bank & Trust Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 725 (8th Cir. 2003)). The rules reflect "the aphorism that it is the parties who know the case better than the judge." *Northwest Bank*, 354 F.3d at 725. And "the application of local rules is a matter peculiarly within the district court's province." *Yannacopoulos v. Gen. Dynamics Corp.*, 75 F.3d 1298, 1305 (8th Cir.1996) (internal quotations and citation omitted). Thus, the court is vested with a large measure of discretion in applying its local rules. *Silberstein v. IRS*, 16 F.3d 858, 860 (8th Cir. 1994).

## DISCUSSION

### A. Atmosphere's Motion for Summary Judgment and Motion to Deem Facts Admitted[5]

#### 1. Background

The pertinent, undisputed facts are as follows:

In approximately May 2011, Henderson, Pumphrey, and Karim began discussing a business arrangement whereby defendants' hotel, which was formerly a Radisson, would be converted into an Adoba® brand hotel. The

---

[5] Defendants argue that Atmosphere's motion for summary judgment is untimely and should be stricken. The court's most recent scheduling order set a motions deadline of March 9, 2015. Docket 194. Atmosphere's motion for partial summary judgment was filed on March 9, 2015, but its statement of material facts was not filed until March 10, 2015. Docket 217; Docket 223. The court concludes that Atmosphere substantially complied with the court's order and that its motion for summary judgment will not be stricken.

Adoba® brand was conceived and created by Henderson and Pumphrey. No other Adoba® hotel existed at that time.

On December 31, 2011, the parties signed two agreements–a licensing agreement and a property management agreement. Under the licensing agreement, Atmosphere granted defendants the right to use Atmosphere's Adoba® brand for defendants' Rapid City hotel. Under the property management agreement, Atmosphere undertook management of the new Adoba® hotel. Defendants terminated both agreements in 2013.

Atmosphere's motion for summary judgment asserts that it is entitled to judgment as a matter of law because defendants' breached several provisions of the parties' agreements. In conjunction with that motion, Atmosphere submitted a list of material facts to establish the predicates for its arguments. Atmosphere contends that several of defendants' responses to Atmosphere's statement of material facts (SMF) are not in compliance with this court's local rules. Atmosphere therefore requests that the court deem the facts that were not properly responded to as admitted or conclude that there is no genuine dispute concerning those facts. The court will address Atmosphere's motion to deem facts admitted first. The facts that the court deems admitted or that are free from dispute will be considered in support of Atmosphere's motion for summary judgment. The facts that are not deemed admitted or that remain in dispute will be considered disputed. Additionally, Atmosphere asks this court to deem facts admitted that are not relevant to the parties' summary judgment motions – namely, SMFs #8, 9, 38, 83, 85, 88, 89, 90, 129, 138, 145, 146, 147,

149, 163, and 164. Because the resolution of those issues is not relevant to this decision, the court denies as moot Atmosphere's request to deem those facts admitted.

### a.    Atmosphere's motion to deem facts admitted

**Atmosphere's SMF #5**: "Henderson and Pumphrey designed, created, and trademarked the Adoba® brand, its marks, concept, and proprietary secrets." Docket 223 at 2 (citing Docket 219-3, -4, -6, and -15).

Defendants responded that "[i]t is not disputed that Henderson and Pumphrey design[ed], created, [and] trademarked the name 'Adoba.' " Docket 236 at 2. Defendants do not address Atmosphere's assertions concerning the Adoba® brand, its marks, concept, or proprietary secrets. The court concludes SMF #5 is admitted.

**Atmosphere's SMF #6**: "On or before April 22, 2010, Henderson and Pumphrey created Atmosphere, a company which manages Adoba® hotels." Docket 223 at 2 (citing Docket 219-6).

Defendants responded that "[i]t is not disputed that Atmosphere was incorporated by Henderson and Pumphrey on or before April 2[2], 2012." Docket 236 at 2. Defendants do not refute Atmosphere's contention that the company manages Adoba® hotels. The court concludes SMF #6 is admitted.

**Atmosphere's SMF #30:** This SMF concerns defendants' Exhibit Y that was introduced at the October 2013 preliminary injunction hearing.

Exhibit Y depicts an email allegedly sent from Karim to James Henderson on December 31, 2011. Atmosphere's SMF asserts that the email "was never emailed to James Henderson." Docket 223 at 5. The court has already concluded the email shown in Exhibit Y was never sent. Docket 258 (order on

22

motion for sanctions); Docket 288 (order denying defendants' request to reconsider). Thus, there is no genuine dispute that the Exhibit Y email was never sent.

> **Atmosphere's SMF #40**: "Zeljka [Curtullo] signed a mutual non-disclosure and confidentiality agreement." Docket 223 at 6 (citing Docket 219-3).

Atmosphere also cites Docket 30 for support.[6] Docket 30 was an affidavit filed by Atmosphere's counsel on September 6, 2013, in support of Atmosphere's preliminary injunction motion. That affidavit, however, contains a docketing notice that it was filed in error and should be disregarded. The court presumes Atmosphere intended to cite to Docket 33, which is an affidavit filed on September 10, 2013, in support of Atmosphere's preliminary injunction motion. Docket 33-3 is a copy of the confidentiality agreement signed by Curtullo.

Defendants respond that this fact is "[d]isputed to the extent that this is an oversimplification of the contents of the document." Docket 236 at 4. Atmosphere was not, however, asserting anything about the contents of the confidentiality agreement. Rather, Atmosphere asserted that Curtullo signed the document. Defendants have not cited any evidence in the record refuting Atmosphere's showing that Curtullo did sign the document. Thus, the court concludes SMF #40 is admitted.

> **Atmosphere's SMF #41**: "[Curtullo] agreed to keep proprietary information, including intellectual property, design, and other concepts regarding the Adoba® Eco Hotel brand, confidential."

---

[6] Defendants use the same citation several times in its responses. *See e.g.*, Docket 236 at 4 (citing Docket 30 in response to SMF #42-45).

Docket 223 at 6.

Atmosphere cites Docket 30 for support, and the court again presumes Atmosphere meant to cite Docket 33-3, the confidentiality agreement signed by Curtullo. Defendants repeat their objection to SMF #40 that the fact is "[d]isputed to the extent that this is an oversimplification of the contents of the document." Docket 236 at 4. While defendants' response to this SMF is generalized, Atmosphere's SMF nonetheless calls for a legal conclusion regarding the requirements of the nondisclosure agreement. A party cannot dictate a court's resolution of a legal issue by labeling it as a statement of fact and asking the court to deem it admitted. Thus, the court denies Atmosphere's request to do so here.

> **Atmosphere's SMF #44**: "[Curtullo] agreed that she would not use or permit the use of Adoba® Eco Hotel and Suites and Atmosphere Hospitality name, logo, concept, design, trademarks, or other identifying data without Atmosphere's prior written consent." Docket 223 at 6.

Both parties cite Docket 30 for support of their positions, and this court again assumes the intended document is Docket 33-3. But as with SMF #41, Atmosphere's SMF calls for a legal conclusion regarding the requirements of the nondisclosure agreement. Thus, as with SMF #41, the court will not deem this SMF as admitted regardless of defendants' response.

> **Atmosphere's SMF #46**: "Antonio Bellatori was hired to create a design for the rooms at Adoba." Docket 223 at 7 (citing Docket 219-11).

Defendants respond that "[i]t is not disputed that Antonio Bellatori was hired by Shiba to provide design services." Docket 236 at 5. Defendants do not

24

cite any portion of the record to contradict Atmosphere's more specific statement of fact regarding Bellatori's services. Thus, the court concludes SMF #46 is admitted.

> **Atmosphere's SMF #47**: "Antonio Bellatori created a design and prototype for the hotel rooms." Docket 223 at 7 (citing Docket 219-10 and -11).

Defendants respond that "[i]t is not disputed that Antonio Bellatori the [sic] signed a prototype room for Shiba." Docket 236 at 5. Defendants do not cite any portion of the record that indicates Bellatori did not create a design and prototype of the hotel rooms as Atmosphere contends. The court concludes SMF #47 is admitted.

> **Atmosphere's SMF #49**: "Dena Belon of BelonSayre was hired as a LEED-certified[7] designer to create the LEED certification plan and manage the requirements necessary for the hotel renovation to achieve LEED certification." Docket 223 at 7 (citing Docket 219-10).

Defendants respond that "[i]t is not disputed that Dena Belon was hired by Shiba to provide design services." Docket 236 at 5. Defendants do not cite any portion of the record that shows Belon was not hired in the capacity that Atmosphere depicts. The court concludes SMF #49 is admitted.

> **Atmosphere's SMF #50**: "Karim Merali fired Dena Belon after receiving Belon's information as to how to become LEED certified." Docket 223 at 7 (citing Docket 219-10).

Defendants respond that it "[i]s not disputed that Belon was terminated by Merali." Docket 236 at 5. Defendants further suggest that Atmosphere's citation to the record does not support its assertion. The portion of the record

---

[7] LEED is an acronym for "Leadership in Energy and Environmental Design."

cited by Atmosphere is an excerpt from a deposition taken of Sacha. He was asked why Belon was hired and about the timing of her termination. Sacha testified that "[t]he last thing I remember from [Belon] was that she provided a plan of action to – I think it was Jim, it could have been Karim, for how to take – no, not for how to take, but for how to get the property LEED certified." Docket 219-10 at 5. Thus, the court concludes the fact that Belon provided defendants information on how to become LEED certified prior to her termination is not genuinely disputed and it is deemed admitted.

> **Atmosphere's SMF #81**: "[Curtullo] testified her role was never to satisfy LEED requirements or certification." Docket 223 at 11 (citing Docket 219-11).

Defendants responded that Curtullo "testified that there were no LEED checklist[s] to follow however they consciously tried to incorporate certain aspects of LEED products and processes." Docket 236 at 8. This response is not responsive to Atmosphere's SMF. Moreover, Atmosphere's SMF is taken verbatim from Curtullo's testimony. *See* Docket 219-11 at 13 ("My role was never to satisfy LEED requirements or certification[.]"). While Curtullo's testimony also explains that "there were no checklists to comply with, other than what we consciously tried to do knowing certain aspects of what LEED products are and processes are," that does not alter her testimony that her role was not to satisfy LEED requirements or certification. Thus, the court concludes this fact is not genuinely disputed and it is deemed admitted.

> **Atmosphere's SMF #82**: "Neither [Curtullo] nor Sacha Merali utilized any LEED documents or instructions in order to make sure they designed and renovated in a way that would accomplish LEED compliance." Docket 223 at 11 (citing Docket 219-10 and

26

Docket 219-11).

Defendants responded:

> Disputed. [Curtullo] testified that there were no LEED checklist[s] to follow however they consciously tried to incorporate certain aspects of LEED products and processes. [Curtullo] also testified that the intent of the designs that she has done would be to implement as many Eco friendly or eco-conscious (environmentally conscious) elements as possible. Whether these elements will ultimately be used for LEED certification is not within her control as that is a decision of the owner.

Docket 236 at 8 (internal citations omitted). The majority of defendants' argument is not responsive to Atmosphere's SMF. The SMF does not ask, for example, whether Curtullo or Sacha intended to implement environmentally conscious designs generally that also could have been used to obtain LEED certification. Rather, the SMF only asserts that neither Curtullo nor Sacha utilized LEED documents or instructions to ensure that they designed and renovated the hotel to achieve LEED compliance. Curtullo's testimony explains that there were no LEED checklists to follow. She also testified that she was not a LEED certified designer and that her role was not to satisfy LEED requirements or certification. Docket 219-11 at 13. Sacha testified that Belon instructed "how to get the property LEED certified" but that Sacha did not receive those instructions nor did he utilize them. Docket 219-10 at 5. Thus, the court concludes the fact that neither Curtullo nor Sacha utilized any LEED documents or instructions to ensure LEED certification was obtained is not genuinely disputed and it is deemed admitted.

**Atmosphere's SMF #106**: "The Licensed Concept required Silver LEED Certified Renovation or LEED Certification." Docket 223 at

27

16 (citing Docket 219-1).

Defendants did not dispute this assertion but responded that "[t]he LEED certification is listed as a feature of the licensed concept under Exhibit A to the License Agreement." Docket 236 at 10. While defendants' response to this SMF is unclear, Atmosphere's statement nonetheless calls for a legal conclusion regarding the requirements of the license agreement. Thus, the court denies Atmosphere's request to deem this SMF as admitted.

> **Atmosphere's SMF #117**: "The phrase 'independent operation' has the common interpretation within the hotel industry of a hotel with no brand identity or affiliation." Docket 223 at 19 (citing Docket 219-12).[8]

Defendants responded that this SMF was "[d]isputed" without elaboration. Docket 223 at 19. Responding to Atmosphere's motion to deem facts admitted, defendants explain that the materials cited by Atmosphere do not support Atmosphere's assertion.

The document cited by Atmosphere is an unsworn expert report created by Kevin Hanley of Hanley Lodging Advisors, LLC. A number of Circuit Courts of Appeals have held that unsworn expert reports cannot be considered on summary judgment. *See, e.g.*, *Provident Life & Acc. Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) ("Unsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment.") (citation omitted) (alterations in original); *Carr v. Tatangelo*, 338

---

[8] Although this document is labeled as "Exhibit 13," it is located at Docket 219-12. There is no "Exhibit 12."

F.3d 1259, 1273 n.26 (11th Cir. 2003) ("Unsworn statements 'do[] not meet the requirements of [Rule] 56(e)' and cannot be considered by a district court in ruling on a summary judgment motion) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970)) (alterations in original); *see also United States v. TRM, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 426 (6th Cir. 2006); *Scott v. Edinburg*, 346 F.3d 752, 759-60 (7th Cir. 2003). The Eighth Circuit has held that a court can consider an unsworn expert report that has been "cured" by a subsequent affidavit or testimony from the expert affirming the contents of the report. *DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 826 (8th Cir. 2009). Atmosphere, however, relies solely on the unsworn report itself. Thus, and regardless of the adequacy of defendants' response, the court concludes the materials cited by Atmosphere are insufficient to demonstrate that there is no genuine dispute over the meaning of an "independent operation" in the hotel industry and the SMF is not deemed admitted.

> **Atmosphere's SMF #120**: "Licensing of the Adoba® brand and management of an Adoba Hotel were only intended to function jointly." Docket 223 at 19 (citing Docket 219-4).

Defendants responded that this SMF was disputed because "[t]he termination provisions sought to supersede all other provisions of either agreement." Docket 236 at 11. In their brief, defendants explain that the termination provisions "affect[] the relationship of the documents." Docket 251 at 7.

Neither Atmosphere's SMF nor defendants' response to it are free from ambiguity. The SMF could be read to mean that the parties drafted the

licensing agreement and management contract with the understanding that the two contracts were effectively one comprehensive agreement that encompassed most (or all) aspects of the hotel's identity and operation. But the SMF could also be read more narrowly to suggest that the parties understood that defendants could use the Adoba® brand only as long as the parties operated under the management contract. And defendants' response ostensibly suggests that whatever the parties' original understanding of their draft agreements may have been, the finalized contracts established a different relationship between the parties.

In support of its position, Atmosphere cites a portion of Henderson's testimony from the October 2013 preliminary injunction hearing. That testimony is as follows:

> Q: And you understood that the license agreement would deal with the licensing of the brand. The management agreement would deal with the management of the hotel, correct?
>
> A: No. Actually, when Lyle and I worked together, we made sure that Atmosphere owns Adoba and if we managed, that the two have to simultaneously connect, that was the whole purpose of these two agreements written the way they are, to protect the brand and to protect Atmosphere and also protect the owner in a good, contractual way.
>
> Q: So --
>
> A: So they're -- they're tandem. We made them that way.

Docket 219-4 at 3. Henderson also stated that his "understanding with Lyle when we drew up these agreements [was] that both would be concurrent and connected very much so." Docket 85 at 71. At best, Henderson's testimony suggests *his belief* that the two agreements governed the parties' relationship

together and that the agreements overlapped in some unspecified way. But Henderson's testimony is vague to the extent that, as Atmosphere's SMF is worded, the two agreements were "intended to function jointly." The court therefore concludes that the resolution of the parties' intent on that issue is disputed.

> **Atmosphere's SMF #121**: "The License Agreement and the PMA were only intended to govern jointly." Docket 232 at 20 (citing Docket 219-4).

This SMF, like SMF #120, focuses on the parties' intent regarding the interplay of the licensing agreement and property management agreement. Atmosphere's citation in support of this SMF is the same portion of James Henderson's testimony cited for support regarding SMF #120. Because that testimony does not clearly explain the parties' intent with respect to how the two agreements would "function jointly" or "govern jointly," the court concludes this fact remains in dispute.

> **Atmosphere's SMF #153**: "At no time did Karim Merali or any other Shiba owner inform Atmosphere of the ownership change in Shiba." Docket 223 at 25 (citing Docket 219-5).

This SMF references the change in the ownership structure of Shiba that occurred in March 2012. Defendants contended that "Henderson was aware of the fact that the ownership had changed including the addition of Sacha as an owner." Docket 236 at 13. Defendants cite no evidence in the record. Atmosphere cites Henderson's affidavit located at Docket 30, which the court presumes is intended to be Docket 33. Henderson affirmed that "[a]t no time did Karim Merali or any other Shiba owner inform Atmosphere of the

31

ownership change in Shiba." Docket 33 at ¶ 66. Henderson's sworn statement is thus quoted verbatim as the basis for this SMF. Because defendants cite no evidence to the contrary, the court deems this fact admitted.

> **Atmosphere's SMF #154**: "Shiba paid a license fee." Docket 223 at 25 (citing Docket 219-5 at 5).

Defendants contend that "Henderson actually paid himself a license fee." Docket 236 at 13 (citing Docket 237-4). Defendants' citation is the same Exhibit G email the court has deemed inadmissible. Even if the court considered the email, however, there is no suggestion in the email that Henderson paid himself any of the fees.

Atmosphere's citation to the record quotes Karim's testimony at the October 2013 preliminary injunction hearing where he testified that he "paid the management fees for the contract, for the license agreement." Docket 219-5 at 5. While Karim agreed that he paid a management fee, he did not testify that he paid a license fee as Atmosphere's SMF is worded. Thus, the court will not need this fact as admitted.

> **Atmosphere's SMF #157**: "Shiba has refused to sign a new License Agreement that would govern continued utilization of the Adoba brand name." Docket 223 at 25.

Defendants agreed that this fact was "[n]ot disputed" but nonetheless went on to cite the Exhibit A letter that this court has deemed inadmissible. Docket 223 at 25. Because defendants have indicated that they do not dispute this SMF, the court concludes there is no dispute that Shiba has refused to sign a new license agreement that would govern the use of the Adoba® brand name.

**Atmosphere's SMF #158**: "The Adoba® brand name and Adoba® signage is still on the hotel." Docket 223 at 25 (citing Docket 219-4 and -5).

**Atmosphere's SMF #159**: "Shiba continues to use the Adoba® Marks, including trade names and trademarks, on its building, within its building, and on its websites." Docket 223 at 25 (citing Docket 219-3, -19, and -20).

**Atmosphere's SMF #160**: "Shiba continues to use the Adoba® Marks, including trade names and trademarks, on third party websites, including Expedia.com, Priceline.com, VisitRapidCity.com, Booking.com, Travelocity.com, TripAdvisor.com, Yelp.com, Yahoo!Travel, and Cheaprooms.com, on social media websites, including Facebook, and in continued marketing ventures including its billboard, brochures, and other advertisements." Docket 223 at 25-26 (citing Docket 219-3, -19, and -20).

Defendants provided the same response to each of these three statements: "Not disputed that Shiba continues to use the Adoba name." Docket 236. In their brief, defendants acknowledged that these SMFs "are not disputed, per se[.]" Docket 251 at 8.

Henderson testified that the Adoba® name is still on the hotel. Docket 219-4 at 2. Karim acknowledged the Adoba® signage remains on the hotel. Docket 219-5 at 3. Henderson also testified that the Adoba® name was used on a number of websites, such as Expedia, Priceline, and others. Docket 219-3 at 7-8. Similarly, he testified that the name was used on defendants' website and Facebook page. *Id.* at 8-10. Thus, the court deems these three SMFs as admitted.

**Atmosphere's SMF #161**: "In August of 2013, Shiba ran a national article utilizing the Adoba trademark name, logo, and proprietary concept to which Atmosphere did not agree or approve." Docket 223 at 26.

33

Defendants responded that this fact was disputed because "Atmosphere is [sic] authorized Shiba to use the name Adoba." Docket 236 at 15. In support, defendants cite the Exhibit A letter that this court has deemed inadmissible. Even if the court considered that letter, however, it does not give defendants blanket authorization to use the Adoba® name on a national level. Rather, it provides Atmosphere's qualified acquiescence for defendants to use the name while working with vendors.

Atmosphere cites to Exhibit 30 for support of its statement, which the court construes as a citation to Exhibit 33. That exhibit contains an affidavit signed by Henderson where he attested that "In August of 2013, Shiba ran a national article to which Atmosphere did not agree or approve . . . This article utilized the Adoba trademark name, logo, and proprietary concept to further Shiba's revenue streams." Docket 33-1 at 17. Henderson's assertion mirrors Atmosphere's SMF. Because defendants have cited no admissible evidence to the contrary, the court deems this fact admitted.

> **Atmosphere's SMF #162**: "Shiba continues to use exact copies of Atmosphere's property management and reservation systems, which are systems owned and/or licensed by Atmosphere, which was not approved for such use by Atmosphere." Docket 223 at 26 (citing Docket 219-3).

Defendants contend that "[t]he reservation systems or [sic] purchased from a third-party vendor which sells to the general public and [are] not proprietary to Atmosphere, as their own definition of the same exempts items available to the general public." Docket 236 at 15. Atmosphere's SMF did not assert that those systems were proprietary as defendants suggest, but rather

that they belonged to Atmosphere and that Shiba nonetheless continued to use exact copies of them without approval. At the preliminary injunction hearing, Henderson stated that "Shiba [is] currently using a replica of Atmosphere's property management and reservation software system." Docket 219-3 at 11. Henderson testified that Atmosphere owned or licensed those systems. *Id.* And Henderson testified that Atmosphere did not agree to allow defendants use of those systems. *Id.* at 12. Thus, the court concludes this SMF is not genuinely disputed.

> **Atmosphere's SMF #165**: "Renovation of the hotel was ongoing as late as May of 2013." Docket 223 at 26 (citing Docket 219-11).

Although this SMF pertains to the hotel renovations and has no relation to the designs discussed in Atmosphere's SMFs #163 and 164, defendants repeat their objection to those SMFs, that is, "Adoba has no ownership or interest in the designs of individuals employed by Shiba." Docket 236 at 15. Defendants offer no clarification in their brief. During Curtullo's deposition, she was asked whether she was out of the country for a period of time. Responding to that question, she explained that she was out of the country during Christmas and referenced the fact that "[t]he renovation in 2013 ended in about May[.]" Docket 219-11 at 26. Thus, according to Curtullo, the hotel renovation continued through approximately May of 2013. Because defendants' objection is not responsive to this SMF and because they have provided no basis to refute Curtullo's testimony, the court deems this fact admitted.

> **Atmosphere's SMF #169**: "Of the $44,901.19 from check 2597 written on August 14, 2012, $11,514.60 of it went to pay Shiba's construction loan number xxxxxxx6308." Docket 223 at 27 (citing

35

Docket 219-26).

Defendants responded that this fact was "[d]isputed" without any explanation or citation to the record. Docket 236 at 15. Their brief does not address the issue any further. Nonetheless, defendants' response to Atmosphere's third set of discovery included the following request for admission:[9]

> 27. Admit that of the $44,901.19 from check 2597 written on August 14, 2012, $11,514.60 of it went to pay Shiba's construction loan (number 15525226308).
>
> RESPONSE: Admit.

Docket 219-24 at 7. The request for admission is identical to Atmosphere's SMF. Karim is noted as the responding and signing party, and he admitted the fact was accurate. Thus, the court deems this fact admitted.

> **Atmosphere's SMF #170**: "Shiba's Great Western account xxxxx3850 had been used to make loan payments to the construction loan." Docket 223 at 27 (citing Docket 219-26).

Defendants responded that this fact was "[d]isputed" without any explanation or citation to the record. Docket 236 at 15. Their brief does not address the issue any further. Atmosphere's third set of discovery included the following request for admission:

> 28. Admit that Shiba's Great Western account (# 3850) had been used to make loan payments to the construction loan.
>
> RESPONSE: Admit.

---

[9] Although labeled as "Exhibit 26," this exhibit appears at Docket 219-24. There is no Exhibit 12 or Exhibit 24, thus the number of this exhibit is off by two.

36

Docket 219-24 at 7. Atmosphere's SMF mirrored its request for admission, and

Karim admitted to the request for admission. Thus, the court deems this fact

admitted.

> **Atmosphere's SMF #179**: "Another $101,961.60 in payments
> were made to pay down 'loans' which were not approved, not
> allowed by the Property Management Agreement, and unauthorized
> by Atmosphere." Docket 223 at 29 (citing Docket 219-18).

Defendants responded that this fact was "[d]isputed. See paragraph 173,

above." Docket 236 at 16. Atmosphere's SMF #173 stated that "[p]ayments to

Great Western Bank to pay down the renovation or construction loan should

not have been made out of the hotel operating account." Docket 223 at 28.

Although defendants did not dispute that statement, they went on to explain:

> It [sic] be noted however that Great Western Bank has several
> accounts including the account from which the mortgage on the
> Rapid City hotel is paid. The mortgage payments are automatically
> deducted and are an operating expense of the hotel pursuant to
> the agreements executed between the parties. Because the
> accounts have the same owners, overdrafts in any one account
> would be automatically deducted from other owner accounts which
> had sufficient funds. This practice resulted in money being
> removed from the renovation account to cover mortgage payments
> which should have been paid by Atmosphere out of revenue
> generated by the hotel. In these instances, funds would have to be
> restored to the renovation account, from the hotel operations, to
> cover these shortfalls.

Docket 236 at 15-16. This paragraph-length explanation (to an SMF that

defendants acknowledged was not disputed) is unadorned by any citation to

the record. Thus, defendants' objection to SMF #179 is likewise unsupported

by any citation to the record and defendants' brief does not address the issue

any further.

Atmosphere's citation to the record directs the court to Docket 219-17.[10] That document is three pages long and consists of a check signed by Schipman payable to Shiba in the amount of $15,342.03 and two summary charts. One of those summary charts is titled "Total Loan Payments Not Approved," and totals the sum of two numbers listed for 2012 and 2013 to be $101,961.60. Docket 219-17 at 2. Aside from the title of the summary chart, there is no information confirming the assertions in Atmosphere's SMF that those payments truly were "not approved, not allowed by the Property Management Agreement, and unauthorized by Atmosphere." *See* Docket 223 at 29. While the truth of those assertions may be as Atmosphere presents them, because the summary chart is unsupported, the court concludes this fact remains disputed.

**Atmosphere's SMF #190**: "Shiba failed to fund the operating expenses of the hotel." Docket 223 at 32 (citing Docket 219-6).

Defendants disputed this SMF and asserted that "accounting shows there should have been funds sufficient from the hotel operations to pay the normal operating expenses. The contracts provide that only in the event that operating income is insufficient is there [a] requirement to replenish the accounts." Docket 236 at 17 (citing Docket 237-4). Thus, defendants do not dispute that Shiba "failed" to fund the hotel's operating expenses. Rather, defendants contend that Shiba was not required under the circumstances to do so. But defendants' citation to the record is the same Exhibit G email that this

---

[10] Although titled as "Exhibit 18," this exhibit is located at Docket 219-17. Because there is no Exhibit 12, the number for this exhibit is off by one.

38

court held was inadmissible.[11] Even if the court considered the email, however, it is unresponsive to this SMF. And whether Shiba was required to fund the operating expenses under the terms of the contract as defendants contend is a question of law rather than a question of fact.

Atmosphere's citation to the record is to a deposition taken of Henderson in 2014. Henderson was questioned about his response to a report created by James Postma.[12] He testified as follows:

> A:    The first page [of the document] is entitled, Summary of Postma Reporting and Atmosphere Responses. We see a column for 2012 and a column for 2013. And then the first listing is Transfer out to Atmosphere accounts.
>
>     Can you describe what those numbers signify?
>
>     . . .
>
> A:    Yeah. To the best of our ability reading the bank accounts, that's what we determined went out to Atmosphere['s] accounts.
>
> Q:    The next line says, Ops, O-P-S, funding transfers in Adoba Eco Hotel Rapid City?

---

[11] Rather than citing to the court's docket, defendants cited "exhibit D to Clayborne affidavit." Docket 236 at 17. Docket 237-4 is the same April 6, 2013 email the court has excluded. Atmosphere suggests that defendants intended to cite Docket 237-5 instead of Docket 237-4. That exhibit contains 11 pages of spreadsheets, descriptions, calculations, and notations created by James Postma. Although Atmosphere made this observation in its initial brief, defendants' brief in response offers no clarification about the document(s) they intended to rely upon. To the extent defendants intended to cite Docket 237-4, that exhibit is inadmissible (and even if it were, it is not responsive). To the extent defendants intended to cite Docket 237-5, their generalized citation to this complex exhibit without further elaboration or explanation is insufficient to properly dispute Atmosphere's SMF.

[12] It is not clear from the parties' briefs if this is the same Postma report that appears at Docket 237-5 or a different report.

39

A:      Yes.

Q:      Could you explain what's indicated in that line?

A:      Again, this is – to the best of our ability, we look at bank statements and saw what went back in from Atmosphere's accounts into the operations to fund the hotel[']s operations.

Q:      And so what you determined is it was $60,150.70 for 2012?

A:      Correct.

Q:      And $281,520.62 for 2013?

A:      Correct.

Q:      And is the total then indicated on the far right-hand column of $341,671.32?

A:      Correct.

Docket 219-6 at 8. Thus, although Henderson's testimony indicates that Atmosphere paid money into the operating account, it is not clear that defendants "failed" to fund the account as Atmosphere claims. Therefore, the court will not deem this fact as admitted.

**Atmosphere's SMF #191**: "Atmosphere funded the operating account to keep the Hotel operating." Docket 223 at 32 (citing Docket 219-6).

Defendants responded that "Atmosphere merely returned to the hotel operating account monies previously generated from hotel operations but wrongfully taken by Atmosphere." Docket 236 at 17. Defendants cite to the same Exhibit G email the court determined is inadmissible.[13] Even if the court

---

[13] Like with SMF #190, Atmosphere suggested defendants intended to cite Docket 237-5 in response to this SMF. Again, however, defendants offer no clarification on this point.

40

considered it, however, the contents of that email are not responsive to this SMF.

Atmosphere's citation to the record is the same deposition testimony from Henderson referenced in SMF #190. As with SMF #190, that testimony states that Atmosphere paid money into the operations account. Henderson also testified that those funds were used to "fund the hotel[']s operations." Docket 219-6 at 8. The court therefore concludes that there is no dispute the transferred sums went to fund the hotel's operations.

> **Atmosphere's SMF #196**: "Karim Merali admits that Atmosphere was entitled to at least $80,000 for its 10% of Net Operating Income payment for 2012." Docket 223 at 32 (citing Docket 219-7).

Defendants responded that this SMF was "[d]isputed" without any citation to the record. Docket 236 at 17. In their brief, defendants cite for the first time to the Exhibit F exchange the court determined is inadmissible. Even if the court considered Exhibit F, there is no indication that "Atmosphere has been overpaid" for the 10% Net Operating Income service as defendants contest. Docket 251 at 9.

Atmosphere's citation is to a portion of Karim's deposition. He testified as follows:

> Q:   Have you determined how much Atmosphere was entitled to an [Net Operating Income] for 2012?

> A:   It should be less than 90,000 because I've paid for some of the bad service. I paid some of the property tax which alone add up over 100,000. So you – if the NOI is 10 percent and he's – bottom line is 90,000, you're already at 80,000. And if he's taken more than 80,000 he's already overpaid himself.

Docket 219-7 at 4. Although Karim testified that a sum over $80,000 would be an overpayment, he did not admit that Atmosphere was entitled to at least $80,000. Thus, the court concludes this fact remains disputed.

> **Atmosphere's SMF #197**: "James Postma admits that Atmosphere was entitled to at least $93,421.33 for its 10% [Net Operating Income] fee in 2012." Docket 223 at 32 (citing Docket 219-8).

Defendants responded that this SMF was "[d]isputed" without any citation to the record. Docket 236 at 17. In their brief, defendants contend that Postma's "own work product" contradicts Atmosphere's assertion. Docket 251 at 9. Defendants do not, however, cite to any material in the record that supports their argument.

Atmosphere cites to a portion of Postma's deposition from 2014. He was asked a series of questions about two reports, one that Postma himself had made and a version of that report that Postma believed had been altered. Docket 219-8 at 6. Regarding the allegedly altered report, Postma was asked about a line that was added to it which read, "Less management fees taken 2012, $118,221." *Id.* Postma acknowledged that it was his understanding that Atmosphere was entitled to certain management fees pursuant to the parties' agreements that were the equivalent to approximately ten percent of the hotel's net operating income. Postma was then asked:

> Q:   Have you – I realize this addition of the 118,000-and-some thousand dollars was added by someone else, but have you seen that amount other than right now?
>
> A:   The 118,000 would be an approximation of my understanding of what 10 percent of the net operating income is. Although, it might be a touch high. And the reason why I state that is because on the original M3 hard

42

> copy of the 12-31-2012 hard copy of the M3 report, it
> showed at that point in time a balance of $934,000 worth of
> net income. I'm just getting that right now. Per the hard copy
> of the 12-31-2012 report, it shows net operating income of
> $934,213.33. If one were to take 10 percent of that amount,
> that would be $93,421.33.

*Id.* at 7. Thus, Postma did not admit that Atmosphere was entitled to
$93,421.33. Rather, he testified to what ten percent of the hotel's net operating
income would be based on the M3 report from December 31, 2012. There is no
dispute that Postma testified that that amount would be $93,421.33 based on
his reading of a report, but the court will not deem as admitted that Postma
further acknowledged Atmosphere was entitled to at least that amount.

> **Atmosphere's SMF #200**: "Karim Merali believes the 10% Net
> Operating Income fee for a partial year should be calculated based
> on the net operating income as of the date of termination." Docket
> 223 at 33 (citing Docket 219-7).

Defendants responded that "Merali believes that the terms of the
property management agreement, including the terms on payment, would
control the relationship of the parties." Docket 236 at 18. Defendants provided
no citation to the record, however, that supported their claim. In their brief,
defendants reiterated that the parties' agreement should govern their
relationship but again provide no citation to the record attributing such a belief
to Merali.

Atmosphere's citation to the record is to a deposition of Karim taken in
2014. Karim was asked about the industry standard used to determine a
percentage of net operating income when a party manages a hotel for only part
of a year. Docket 219-7 at 5. Relying instead on "[c]ommon sense," Karim

testified that it would be based "on the day you leave[.]" *Id.* Specifically, "if you leave early, you don't get it for the whole year." *Id.* While Karim did not use the word "termination" as stated by Atmosphere's SMF, a fair reading of his testimony is that he believed the appropriate amount of net operating income should be proportional to the amount of net operating income derived during the part of the year when the party managed the hotel. To that extent, the court deems this fact as admitted.

### b.   Atmosphere's motion for summary judgment

Atmosphere asserts that it is entitled to judgment as a matter of law on several breach of contract theories. To succeed on a claim for breach of contract, a plaintiff must establish the following: (1) an enforceable promise; (2) a breach of the promise; and (3) resulting damages. *Guthmiller v. Deloitte & Touche, LLP*, 699 N.W.2d 493, 498 (S.D. 2005). The existence of a valid contract is a question of law. *Werner v. Norwest Bank South Dakota, N.A.*, 499 N.W.2d 138, 141 (S.D. 1993). "It is equally well-settled that whether the parties' conduct constitutes a breach 'presents a pure question of fact that the trier of fact alone may decide.' " *Moe v. John Deere Co.*, 516 N.W.2d 332, 335 (S.D. 1994). As the moving party, Atmosphere bears the burden of identifying the portion of the record that shows there is no genuine factual issue in dispute to support its claims. *Celotex Corp.*, 477 U.S. at 323.

The court assumes for the purposes of this motion that the licensing agreement and property management agreement are valid and enforceable promises. Before the court can address whether defendants have breached any

of the promises within the parties' agreements, however, the court must determine what those promises are. "The construction of a written contract is a question of law." *Alverson v. Nw. Nat. Cas. Co.*, 559 N.W.2d 234, 235 (S.D. 1997) (quoting *Bell v. E. River Elec. Power Coop. Inc.*, 535 N.W.2d 750, 754 (S.D. 1995)). The proper interpretation of a contract must give effect to the intention of the contracting parties. *Ziegler Furniture & Funeral Home v. Cicmanec*, 709 N.W.2d 350, 355 (S.D. 2006). If the parties' intent is clearly manifested by the language of the contract, it is the court's duty to enforce it. *Pesicka v. Pesicka*, 618 N.W.2d 725, 727 (S.D. 2000). The language of the contract is given its "plain and ordinary meaning" unless the language is ambiguous. *Am. State Bank v. Adkins*, 458 N.W.2d 807, 809 (S.D. 1990) (citing Restatement (Second) of Contracts § 202(3)). Whether a contract is ambiguous is a question of law. *Ziegler*, 709 N.W.2d at 355. Contract language is ambiguous if a "genuine uncertainty exists as to which of two or more meanings is correct." *Am. State Bank*, 458 N.W.2d at 809. When a contract is ambiguous, the intention of the parties becomes a question of fact which must be resolved by the jury. *Vollmer v. Akerson*, 688 N.W.2d 225, 229 (S.D. 2004) (quoting *N. River Ins. Co. v. Golden Rule Const., Inc.*, 296 N.W.2d 910, 921 (S.D. 1980)). No ambiguity exists, however, if the parties simply "differ as to the interpretation of the contract." *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 713 (S.D. 2005). If contract language is not ambiguous, the contract "cannot be enlarged or diminished by judicial construction." *Econ. Aero Club, Inc. v. Avemco Ins. Co.*, 540 N.W.2d 644, 645 (S.D. 1995).

### i.   Did defendants breach the licensing agreement by their continued use of the Adoba® brand and processes?

Atmosphere contends that defendants breached the licensing agreement by their continued use of the Adoba® brand and processes following defendants' termination of the parties' agreements. Defendants argue that the licensing agreement gives them the authority to keep the Adoba® brand and processes even after the termination of the agreements. There is no dispute that Atmosphere, through Henderson and Pumphrey, designed, created, and trademarked the Adoba® brand and processes at issue here. There is also no dispute that defendants' hotel continues to bear the Adoba® name and signage to this day. Likewise, there is no dispute that defendants continue to use the Adoba® name on their website and on several third-party websites.

Section 12 of the licensing agreement sets forth defendants' obligations upon termination or expiration of the agreement. Section 12.a provides that upon cancellation of the licensing agreement, defendants will:

Immediately discontinue all use of the Marks[14] and any word or mark similar to the Marks, and refrain from using the Marks to

---

[14] Section 1.n states:
"Marks" means all of Atmosphere's trademarks and trade names and includes the trademarks set forth on Exhibit B, which is attached to this Agreement and incorporated by this reference, the trade names set forth on Exhibit C, which is attached to this Agreement and incorporated by this reference, and all associated Adoba® URL addresses and other intellectual property owned by Atmosphere and used with the Licensed Concept. The term includes the related all forms of logos, designs, stylized letters, images, and colors that identify or define the brand in all formats, including without limitation on social media or otherwise distributed on-line, that are approved for use with the Licensed Concept from time to time at the Hotel and in advertising for the

> identify the Hotel. All signage and other identifying equipment that
> use any of the Marks in any form shall be immediately removed
> from the interior and exterior of the Hotel.

Docket 219-1 at 13. Standing alone, § 12.a requires defendants to immediately

discontinue all use of the Adoba® brand and processes upon termination of the

agreement. But the introduction to § 12 provides in pertinent part that § 12 is

"[s]ubject to other provisions herein, including section 3.b, on termination or

expiration of the Licensing Agreement for any reason . . . ." Docket 219-1 at 13.

Thus, the court must look to § 3.b to determine what effect it has, if any, on

the requirements of § 12.a. Section 3 is entitled "Term; Conditional

Termination Rights," and § 3.b provides that:

> Notwithstanding the foregoing, [Shiba] or Atmosphere can cancel
> this contract without cause with 90 days written cancellation at
> any time, without any penalties. *This clause supersedes any other
> cancellation or termination clause in this entire agreement.* Due to
> the nature and circumstances of a deep and long lasting
> friendship, [Shiba] and Atmosphere both agree that a termination
> will have significant impact on either party and as such each party
> should leave the agreement with [a] vested interest. *[Shiba] will
> keep the technology and the Adoba Brand as an independent
> operation. If [Shiba] chooses not to continue [the] use of the Adoba
> Brand, [it] will remove all brand material and signage in a
> reasonable time mutually agreed upon.* In any event, upon
> termination of this agreement by [Shiba], Atmosphere will receive
> all current monies due in full to date.

Docket 219-1 at 5 (emphasis added). Thus, § 3.b permits defendants to keep

the "the technology and the Adoba Brand" upon termination of the agreement,

---

> Hotel. The term includes any other additional or substituted
> trademarks, trade names, service marks or logos that Atmosphere
> later adopts and authorizes [Shiba] in writing to use. [Shiba] agrees
> to operate the Hotel exclusively under the Marks and the trade
> name "Adoba® Eco Hotel" during the Term (defined below) and the
> term of the Management Agreement.

Docket 219-1 at 3.

and provides that defendants must remove the "brand material and signage" only if they choose not to continue using "the Adoba Brand." And because § 3.b supersedes the provisions in § 12, it supports defendants' contention that they were (and still are) permitted to continue using the Adoba® brand and processes after the agreement was terminated.

Several other provisions of the contract, however, appear to conflict with defendants' reading of the agreement. For example, § 8 is entitled "Atmosphere's Intellectual Property; Confidentiality," and § 8.a states that:

> [Shiba] acknowledges and agrees that the Licensed Concept, including the Manuals, the Marks, the System, and the Rules and Regulations *are the sole property of Atmosphere* and agrees not to claim any interest therein except to the extent provided to the Hotel based on [sic] specifically on this License Agreement, nor will [Shiba] contest: (i) Atmosphere's rights to the Licensed Concept, the Manuals, the System, or any of the Marks, as they exist as of the Effective Date or as modified in the future . . . *[Shiba] understands and agrees that: the Licensed Concept, the Manuals, the System, and the Marks are and will remain the sole and exclusive property of Atmosphere*; [Shiba's] use of the Licensed Concept, the Manuals, the System, and the Marks in connection with the Hotel inures to Atmosphere's benefit; and [Shiba] will immediately assign to Atmosphere upon its request any rights to the Licensed Concept, the Manuals, the System, or the Marks that [Shiba] may gain through its ownership of the Hotel.

Docket 219-1 at 6. Thus, § 8.a provides that the Adoba® brand and processes will remain the "sole and exclusive property of Atmosphere," that defendants will not contest Atmosphere's rights to the Adoba® brand and processes, and that defendants' use of the Adoba® brand and processes "inures to Atmosphere's benefit." Section 8.a therefore conflicts with the notion that defendants could continue using the Adoba® brand and processes after the agreements were terminated. Additionally, recital A provides that "Atmosphere

48

is the sole Licensee and exclusive owner" of the Licensed Concept while recital B states that "Atmosphere is willing to grant a limited, non-exclusive license to the Licensed Concept to [Shiba]." Docket 219-1 at 1. And recital C provides that the grant of that license is "expressly conditioned upon . . . Atmosphere's operation and management of the Hotel." *Id.* Read together, those three recitals suggest that defendants can no longer use the Adoba® brand and processes if Atmosphere is no longer operating and managing the hotel.

Atmosphere argues that § 8 and the recitals are unaffected by § 3.b because § 3.b only "supersedes any other cancellation or termination clause" in the agreement. According to Atmosphere, the obligations imposed by § 8 and the recitals, i.e., that the Adoba® brand and processes are the "sole and exclusive property of Atmosphere" that would return to Atmosphere once Atmosphere stopped managing the hotel, would remain in effect. While that is one plausible reading, another plausible reading of § 8 and the recitals is that those provisions govern only while the agreement is in effect. Section 3.b acknowledges "that a termination will have [a] significant impact on either party and as such each party should leave the agreement with [a] vested interest." Docket 219-1 at 5. And according to § 3.b, one of those vested interests is defendants' option to keep "the technology and the Adoba Brand."

Reading the licensing agreement as a whole, the court concludes that it is susceptible of two separate meanings. Under one interpretation of the contract, defendants were permitted to keep the Adoba® brand and processes after the agreement was terminated. Under another interpretation, the Adoba®

49

brand and processes are the sole property of Atmosphere that defendants could only use for as long as Atmosphere managed the hotel. Because the agreement is capable of more than one meaning, it is ambiguous. *Am. State Bank*, 458 N.W.2d at 809; *see also Jones v. Siouxland Surgery Ctr. Ltd. P'ship*, 724 N.W.2d 340, 346 (S.D. 2006) ("... an ambiguity will be found when conflicting provisions cannot be reconciled to give meaning to all provisions and when they are susceptible to more than one fair, honest, and reasonable interpretation.").

Atmosphere contends that, if the court deems the agreement ambiguous, that the court should construe the ambiguous provision against its drafter. *Cf. Delzer Const. Co. v. S.D. State Bd. of Transp.*, 275 N.W.2d 352, 357 (S.D. 1979). Defendants acknowledge that Karim added the language to § 3.b that would allow defendants to keep the technology and Adoba® brand as an independent operation as well as the language that § 3.b supersedes all other cancellation or termination provisions. Docket 223 at 4 (SMFs #22 and #23); Docket 236 at 3 (responding "Not disputed" to Atmosphere's SMFs #22 and #23). According to Atmosphere, the court should therefore construe the agreement so that the language of § 12.a governs. But the ambiguity is not strictly in the interplay between § 12 and § 3.b. Section 12 explicitly states that it is subject to § 3.b. The ambiguity also arises between the language in § 3.b and the language in § 8 and the recitals. And Atmosphere's solution is not to construe the ambiguity against defendants but rather to read § 3.b out of the contract. Because the contract is ambiguous, however, the intentions of the parties becomes a

question of fact for the jury to determine. *Vollmer*, 688 N.W.2d at 229. Thus, summary judgment on this issue is denied.

### ii.   Did defendants breach the property management agreement by their continued use of the Adoba® brand and processes?

Atmosphere's argument here is substantively the same as its first argument concerning defendants' continued use of the Adoba® brand and processes. The difference is that Atmosphere contends defendants are also in breach of the property management agreement.

Recital F of the property management agreement states that "Atmosphere's agreement to grant a license to the Licensed Concept for the Property is expressly conditioned upon . . . Atmosphere's continuous operation and management of the Hotel." Docket 219-2. This recital is essentially the same as recital C in the licensing agreement. Nonetheless, recital F sheds no light on the ambiguity that exists between § 3.b of the licensing agreement and the other provisions that suggest that defendants could use the Adoba® brand and processes only while Atmosphere managed the hotel. The parties' intentions must still be determined by the jury. Thus, summary judgement on this issue is denied.

### iii.   Did defendants breach the licensing agreement by failing to pay a transfer fee to Atmosphere?

Atmosphere argues that it was entitled to a fee based upon a change in the ownership structure of Shiba and that defendants breached the licensing agreement by failing to pay that fee. It is undisputed that at the time Shiba

51

entered into the licensing agreement, Panju Merali owned 48% of Shiba, Karim owned 44%, Azim Merali owned 4%, and Yasim Merali owned 4%. It is further undisputed that in March of 2012, Shiba's ownership structure changed to the extent that Karim owned 48% of Shiba, Sacha owned 22%, Mehdi Merali owned 22%, Azim Merali owned 4%, and Yasim Merali owned 4%.

Section 4 of the licensing agreement provides for the payment of several fees. Section 4.b pertains to a "Licensed Concept Buy-in Fee," and states that:

> There will remain a transfer fee of $30,000 in the event that [Shiba] shall desire to transfer the franchise to a new owner who desires to use the Adoba Marks.

Docket 219-1 at 5. Section 10 of the agreement pertains to assignments of the parties' rights under the agreement. Section 10.b states in pertinent part that:

> [Shiba's] rights and duties under this License Agreement are personal to it. . . . *Furthermore, if a Controlling Interest in [Shiba] is proposed to be transferred* or if [Shiba] proposes to convey the Hotel or more than a 50% undivided interest in the Hotel, *[Shiba] and its proposed assignee shall also comply with such reasonable conditions as Atmosphere may require to document such assignment, including without limitation* the execution of the then-current form of this License Agreement by the transferee *and payment of a re-licensing fee equal to the then-current Licensed Concept.*

Docket 219-1 at 8 (emphasis added).[15] Reading §§ 4.b and 10.b together, Atmosphere would be entitled to a fee equal to the Licensed Concept fee of $30,000 if a "Controlling Interest" in Shiba was proposed to be transferred.

---

[15] Section 10.b states that "[c]lauses 3b and 4b supersede the language of this paragraph." Neither of those clauses pertain to the assignment of a parties' rights or a transfer of a controlling interest in Shiba, so the court construes § 10.b as it applies to this issue as being unaffected by §§ 3.b and 4.b.

Section 10.a provides that the phrase "Controlling Interest" is "defined below." Docket 219-1 at 8. It is not.[16] Nonetheless, § 1.a provides that the "[t]erms used in this Agreement, whether capitalized or otherwise, that are not otherwise defined in this Agreement, shall have the meanings generally given them in the hospitality industry." Docket 219-1 at 1-2. Neither party offers a definition of the phrase "Controlling Interest" as it is generally understood in the hospitality industry. Presumably, a controlling interest in a corporation like Shiba would be the ownership of a greater-than 50% of the voting stock. By that definition, a controlling interest in Shiba was never transferred. Rather, Panju's 48% interest in the corporation was transferred and redistributed among several members of the Merali family in March of 2012, but Panju's interest was neither a controlling interest nor did the redistribution result in any single stockholder possessing a controlling interest in Shiba. Nonetheless, at the preliminary injunction hearing, Karim was asked about his ownership interest in Shiba by the court. The following exchange occurred:

Q:     So you became the controlling interest?

A:     Correct.

Docket 86 at 33. Later, however, Karim was questioned by counsel concerning the distribution of voting power in Shiba. The following exchange occurred:

---

[16] When Atmosphere moved for a preliminary injunction, it attached a version of the licensing agreement that it asserted was the original, non-altered version. *See* Docket 33-1. That document contains § 10.c, which is missing from the parties' executed contract, that defines "Controlling Interest" as "any general partner's interest in a partnership entity, 50% or more of the voting stock of a corporate entity, and 50% of [sic] more of the ownership interests in a limited liability company or joint venture." *Id.* at 14.

> Q:   And I've heard the testimony that you own how much?
>
> A:   48 percent now.
>
> Q:   And then the remaining ownership is in your children and your brother and sister?
>
> A:   That's correct.
>
> Q:   And that would be 52 percent?
>
> A:   That is correct.
>
> Q:   Under Shiba, how is – how is voting determined?
>
> A:   Everybody votes, I guess.
>
> Q:   So are there situations where your 48 percent could be trumped, if you will?
>
> A:   Oh, easily. If I was deemed unfit by the family, they would vote me out.
>
> Q:   And how would they do that?
>
> A:   Well, they're 52 and I'm 48.

Docket 86 at 88. Thus, Karim's testimony supports the conclusion that the transfer of Panju's interest did not involve a transfer of a controlling interest in Shiba. Atmosphere has the burden of demonstrating that there is no dispute a controlling interest in Shiba was transferred. Because Atmosphere has not met its burden,[17] summary judgment is denied.

---

[17] The court is aware that Atmosphere's SMF #152 stated: "In April of 2012, Karim Merali became the controlling interest in Shiba" and that defendants responded that this fact was "[n]ot disputed." Docket 223 at 24; Docket 236 at 13. Atmosphere's citation to the record is to the same exchange between the court and Karim. Why defendants chose not to dispute this fact is unknown, but the court concludes it would be unjust to declare defendants' liability summarily when Merali's testimony suggests the opposite is true.

### iv.   Did defendants breach the licensing agreement by not paying monthly fees?

Atmosphere contends that several other fees were due to it under the licensing agreement. Section 4.c provides for the payment of certain monthly fees that Shiba would pay to Atmosphere. The paragraph states, however, that those monthly fees would not begin to come due until "the tenth day of the 37th month following the Opening Date[.]" Docket 219-1 at 5. Section 1.o defines "Opening Date" as "the later of 1 February 2012 or the date the Hotel has met the conditions for opening as set forth in this Agreement." Docket 219-1 at 3. Atmosphere has not presented any facts establishing when the "Opening Date" occurred, if it occurred at all. Thus, the court cannot determine when the "tenth day of the 37th month" after the opening date would be. Summary judgment on this issue is therefore denied.

### v.   Did defendants breach the licensing agreement by not completing hotel renovations by December 31, 2013, or achieving LEED certification?

Atmosphere argues that defendants breached the licensing agreement by not completing the hotel renovations on time. Additionally, Atmosphere contends that defendants breached the licensing agreement because they failed to achieve LEED certification for the hotel.

Regarding Atmosphere's renovation deadline argument, § 11.b provides that if "[Shiba] fails to complete the Adoba® Hotel Renovations before the Renovation Completion Deadline" then Shiba would be in default of the licensing agreement. Section 1.r defines the "Renovation Completion Deadline"

as "the date referred to in Section 5(f) by which all of the Adoba® Hotel Renovations to the Property have been completed[.]" Section 5(f) does not exist. Section 5(e), however, is entitled "Continuation and Completion," and subsection (i) states that:

> [Shiba] shall proceed diligently with renovation [sic] the Hotel in accordance with the Renovation Schedule and the Final Plans, without unreasonable delay or interruption, until the renovated Hotel is ready for final inspection and approval by Atmosphere. The initial target date of completion for the Adoba® Hotel Renovations is 31st December 2013 after the Opening Date (the "Renovation Completion Deadline").

Docket 219-1 at 9. Thus, the renovation deadline for the hotel had an "initial target date" of "31st December 2013 after the Opening Date." Section 1.o defines "Opening Date" as "the later of 1 February 2012 or the date the Hotel has met the conditions for opening as set forth in this Agreement." Docket 219-1 at 3. Reading these provisions together means that the "Opening Date" could be no earlier than February 1, 2012, and no later than December 31, 2013, which is also the initial target date for the renovations to be completed.

Atmosphere's brief was filed on March 9, 2015. It states that "Renovations are still ongoing at the Hotel." Docket 218 at 15. In support, however, the brief cites "SMF x.x." *Id.* Atmosphere's SMF #165 asserted that renovations were ongoing as late as May of 2013. The court has deemed this fact as admitted. But May of 2013 is before the December 31, 2013 deadline. Moreover, § 5(e)(i) states that defendants were to "proceed diligently" with the hotel renovations, and recital D states that "[Shiba] is willing to use its best efforts" to complete the hotel renovations.  Docket 219-1 at 1. Reading that

56

language along with the "initial target date" language of § 5(e)(i) suggests that the December 31, 2013 deadline was not set in stone. There is a question of fact as to whether defendants proceeded diligently or used their best efforts to complete the renovations by that initial deadline.

As to Atmosphere's LEED certification argument, there is language in the contract that suggests achieving LEED certification was a requirement of the hotel's renovation. For example, the "Licensed Concept" is described in recital A and "includes without limitation the quality, renewable energy, and sustainable-practices features set forth on Exhibit A, which is incorporated by this reference (the 'Concept Features')." Docket 191-1 at 1. Among the features listed in the incorporated exhibit is a bullet point that reads: "Silver LEED® Certified Renovations or LEED Certified." Docket 219-1 at 25. Section 1.l defines "LEED® Certification" as "compliance with the 'Certified' or 'Silver' certification program developed by the [United States Green Buildings Council] as the nationally accepted benchmark for design, construction and operation of high-performance green buildings." Docket 219-1 at 3. Reading these provisions together, compliance with the "Silver" or "Certified" LEED certification program was one of the features of the Licensed Concept.

Further, § 1.b defines "Adoba® Hotel Renovations" as:

[T]he Final Plans (defined below) as approved by Atmosphere under Section 5 below, which *shall* include such renovations and modifications to the Property and its amenities, procedures, and operations as are necessary for the Hotel to be certified as LEED® status and as otherwise deemed necessary by Atmosphere for the Property to comply *in all material respects with the Licensed Concept.*

57

Docket 219-1 at 2 (emphasis added). The phrase "Final Plans" is not defined in Section 5 or any other part of the signed agreement.[18] But, according to the Adoba® Hotel Renovations definition, those plans were to include the renovations necessary for the hotel to comply "in all material respects" with the Licensed Concept, which would include LEED certification.

Other language in the contract, however, suggests that achieving LEED certification was not mandatory. For example, § 5.a provides that "[Shiba] agrees to develop [sic] to renovate, furnish, and equip the Hotel on the Property *in substantial compliance* with the Licensed Concept." Docket 219-1 at 10. And recital D states in relevant part:

> [Shiba] is willing to *use its best efforts to undertake the Adoba®*
> *Hotel Renovations and otherwise to renovate the Property in*
> *accordance with the Licensed Concept . . .* [Shiba] will renovate and
> control design *keeping in mind* [the] Adoba Concept.

Docket 219-1 at 1. And §§ 1.r and 5(e)(i) provide that those renovations had an initial deadline of December 31, 2013, and that defendants would use their best efforts to meet that deadline.

Reading the licensing agreement as a whole, the court concludes it is capable of two separate meanings. On one hand, the contract could be interpreted to mean that defendants were required to renovate the hotel in a manner that would achieve strict compliance with all aspects of the Licensed Concept, including LEED certification. On the other hand, the contract could be interpreted to mean that defendants were only required to use their best

---

[18] Section 5.c(i) notes the creation of a "final renovation plan" but there is no specific definition of what that plan entails. Docket 219-1 at 9.

efforts to achieve substantial compliance with the Licensed Concept, of which LEED certification is but one aspect. Because the contract is ambiguous, the intentions of the parties becomes a question of fact for the jury to determine. *Vollmer*, 688 N.W.2d at 229. Thus, summary judgment on this issue is denied.

### vi.   Did the parties agree to the payment of attorneys' fees?

Atmosphere's next argument concerns § 18 of the licensing agreement. Section 18 pertains to the payment of attorneys' fees that may be incurred in certain actions between the parties. Atmosphere does not, however, argue that it is entitled to summary judgment because defendants were required to pay Atmosphere's attorneys' fees and that there is no factual dispute that defendants failed to do so. Rather, Atmosphere asks the court to interpret the interplay of § 18 with § 3.b in a manner similar to an action for declaratory judgment. But Atmosphere has neither sought declaratory relief nor has Atmosphere provided the court with the factual predicate underlying its breach of contract claim that the present motion is based upon. Thus, the court denies Atmosphere's motion for summary judgment on this issue.

### vii.   Did Curtullo breach her confidentiality agreement?

Atmosphere asserts that Curtullo breached a confidentiality agreement that she signed in 2012. *See* Docket 33-3. Although not discussed by either party, the confidentiality agreement contains a choice of law provision stating that the agreement is "governed by, and construed in accordance with" the laws of Delaware. Docket 33-3 at 4. "Delaware adheres to the 'objective' theory

59

of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quotation omitted). Like courts in South Dakota, courts in Delaware interpret contracts "according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). Contracts must be read "as a whole, and, if possible, reconcile all the provisions of the instrument." *Id.* at 386 (quotation omitted).

The entirety of Atmosphere's argument is presented in two sentences. First, that Curtullo "agreed not to use the Adoba name, logo, concept, design, trademarks, or other identifying data." Docket 218 at 17. And second, that Curtullo "continued to use the Adoba name to renovate during the time period she promised not to." *Id.*

The court begins with Atmosphere's second assertion because it contains the factual basis for Atmosphere's argument. Atmosphere cites relies on facts set forth in SMFs #91 and #92, which defendants did not dispute. Docket 223 at 13; Docket 236 at 9. These two SMFs indicate that either Curtullo, Sacha, or Karim decided to include Sacha's and Curtullo's names on certain murals in the hotel indicating that Sacha and Curtullo were responsible for creating the designs but that Atmosphere did not approve of such attribution.

For Atmosphere's first proposition, it cites paragraph four of the agreement which states in part that:

> All Information provided by Atmosphere Hospitality: (a) shall remain the property of Atmosphere Hospitality; (b) shall be treated as confidential by Recipient . . . (c) shall be used solely for

60

> purposes of evaluating the Transaction as provided in this
> Agreement, and for no other purpose; and (d) shall not be disclosed
> to any party . . . without Atmosphere Hospitality's prior written
> consent.

Docket 33-3 at 2. The agreement defines "Proprietary Information" as including

the "Adoba Eco Hotel & Suites business concept, performance, design,

renderings, intellectual property[,]" among other things. *Id.* at 1. Thus,

Atmosphere's position is that the designs for the murals were its proprietary

information and that Curtullo breached the confidentiality agreement by

utilizing that information in an unauthorized manner.

Atmosphere does not, however, sufficiently address other provisions of

the confidentiality agreement that are relevant to this issue. For example, the

agreement states that "for proprietary information disclosed by one party to the

other to be protected in accordance with this Non-Disclosure Agreement, it

must be" both "in writing" and "clearly identified as proprietary information at

the time of its disclosure[.]" *Id.* Atmosphere has not provided any factual

information that those two steps were taken regarding the design for the

murals. Additionally, the agreement provides that Atmosphere's proprietary

information *shall not* include, among other things, "information independently

developed by Recipient without reference to the Information[.]" *Id.* at 2. During

her deposition, Curtullo testified that she knew Antonio Bellatori was hired to

create a prototype for the rooms but she felt "he didn't provide a design."

Docket 219-11 at 4. It is defendants' position that the murals were developed

independently from any material provided by Atmosphere. Thus, questions of

fact remain concerning whether any mural designs provided by Atmosphere

were in fact the proprietary information of Atmosphere or whether the actual designs used by defendants were developed independently. Thus, summary judgment on this issue is denied.

> ### viii.   Did defendants breach the property management agreement by failing to pay Atmosphere monthly management fees?

Atmosphere asserts that it was entitled to certain monthly fees pursuant to the property management agreement and that defendants breached the agreement by not paying those fees. Article IV of the property management agreement pertains to fees. Section 4.01 provides that:

> As compensation for the services rendered by Atmosphere under this Agreement, [Shiba] shall pay the Management fee (defined below) and the Management Fees to Atmosphere beginning on the Opening Date.[19]

> 10% of pure net operating profit as defined earlier.

Docket 222-2 at 10. Atmosphere notes the grammatical incongruity between the phrases "Management fee" and "Management Fees." Additionally, Atmosphere argues that by using "and the" to separate the two phrases, the agreement contemplates the payment of two distinct fees. The first is a "Management fee," amounting to 10% of pure net operating profit, and the second are "Management Fees," which the agreement does not define. For

---

[19] The "Opening Date" for purposes of the property management agreement was defined as February 1, 2012. Docket 222-2 at 3.

additional support, Atmosphere observes that §§ 4.01(e)(1)(ii),[20] 4.01(e)(1)(iii), and 4.02 use the phrase "Management Fees" rather than "Management fee."

The problem with Atmosphere's construction of the contract is that such a reading would render the agreement incomplete. For example, Atmosphere acknowledges that the phrase "Management Fees" is not independently defined and that there is no way to calculate what that fee would be. But if Atmosphere cannot show what amount it was owed under the agreement, Atmosphere cannot show that defendants failed to pay an amount that was due. And if § 4.02 means that only "Management Fees" are due on or before the 10th of each month beginning with the Opening Date, the agreement would be silent as to when the "Management fee" was due.

The court concludes that the plain language of the agreement contemplates payment of a single, reoccurring fee. Under this reading, the initial management fee and all subsequent management fees would be calculated by taking 10% of pure net operating profit. The payment of those fees would then begin on the Opening Date, with a due date of the 10th of each month. Because the extent of Atmosphere's argument was that the otherwise undefined "Management Fees" were a separate fee that went unpaid, the court denies summary judgment on this issue.

---

[20] The provision begins with § 4.01(e). Subsections 4.01(a)-(d) do not exist.

ix.   **Did defendants breach the property management agreement by failing to reimburse Atmosphere for operating expenses?**

Atmosphere contends that it was entitled to reimbursement for amounts that it paid into the hotel operating account for operating expenses. Section 2.14 of the property management agreement provides:

> *If at any time sufficient funds are not then available* in Property Accounts to pay all Operating Expenses, Management Fees, and insurance premiums, Atmosphere is authorized to allocate available funds among such then-existing costs and expenses according to its reasonable business judgment. *Atmosphere shall have no obligation to advance any of its own funds in connection with the operation of the Property but, if Atmosphere advances any funds for the benefit of the Property, such advances shall be charged as Operating Expenses. Owner shall reimburse Atmosphere for any advances not paid from Property Accounts within five business days after Atmosphere's request.* All amounts due to Atmosphere under this Agreement that are not paid when due shall bear interest at a rate per annum equal to the lesser of: (a) the "prime" rate of interest published from time to time in the *Wall Street Journal*.

Docket 222-2 at 6 (emphasis added).

Atmosphere contends that defendants failed to fund the hotel's accounts and that Atmosphere was required to use its own money to cover the lack of funding. Atmosphere cites its SMFs #190 and #191. Regarding SMF #191, the court has already concluded that there is no dispute that Atmosphere transferred money into the operating account that was used to fund hotel operations. As to SMF #190, however, the court found that whether defendants actually failed to fund the hotel's accounts was genuinely disputed. As the party seeking summary judgment, Atmosphere bears the burden of identifying the portion of the record that shows there is no genuine factual issue in

64

dispute to support its claims. Atmosphere has not met its burden. Therefore, summary judgment on this issue is denied.

>    **x.    Did defendants breach the property management agreement by interfering with Atmosphere's employees?**

Atmosphere asserts that defendants improperly directed Atmosphere's employees in violation of the property management agreement. Recital I of the property management agreement provides that "All employees will be employed by Atmosphere. Shiba and its principal will not give orders or instruct employees, but rather address any concerns with a supervisor of Atmosphere." Docket 222-2 at 2. This recital is mirrored in § 2.05. *See id.* at 4 ("All Employees shall be employed by Atmosphere. Owner shall not interfere with or give orders or instructions to Employees, but shall refer any questions or concerns regarding the Property to the Atmosphere Operations Supervisor for the Property."). Under the terms of these provisions, defendants could not "order" or "interfere" with Atmosphere employees, but those phrases are not defined further. The Oxford Dictionary defines "order" in this context as issuing "[a]n authoritative command, direction, or instruction"[21] and defines "interfere" as to "[p]revent (a process or activity) from continuing or being carried out properly."[22]

---

[21] Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/order (last visited December 28, 2015).

[22] Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/interfere (last visited December 28, 2015).

Atmosphere cites a single fact in support of its position. Specifically, Atmosphere relies on its SMF #181 which asserted that "Dan Schipman wrote renovation checks at the direction of Karim, Sacha, and Zeljka." Docket 223 at 29. Defendants did not dispute this SMF. Docket 236 at 16. Atmosphere asserts that defendants' "direction" of Schipman was improper.

Schipman is an accountant who provided accounting services for both Atmosphere and defendants. Atmosphere has not cited any portion of the record establishing that Schipman was an "employee" of the hotel within the meaning of the property management agreement. Additionally, in Schipman's deposition, he was asked if he continued to work with Karim while he was being paid by Atmosphere. Docket 219-9 at 2. Schipman testified "Not really, no." *Id.* When Schipman was asked what he meant by that, he testified that "I talked to him. That's about it." *Id.* And in the portion of his deposition that forms the basis for Atmosphere's argument, Schipman testified as follows:

> Q:  Okay. What did you have to do prior to writing the checks to determine –
>
> A:  They bring me the invoice and I supply the check. They signed the checks and do what they – whatever they want with them.
>
> Q:  Okay. You said they bring you the invoice. Who is they?
>
> A:  The people in the renovation office, Karim, Sacha, Zeljka.

*Id.* Thus, and assuming Schipman is an employee of Atmosphere, his testimony establishes at most that defendants brought him invoices from time to time and that Schipman would write a check for the payment of those invoices. Whether that conduct constitutes giving an authoritative command,

66

direction, or instruction, or otherwise preventing Schipman from continuing or carrying out a task properly is a question of fact for the jury. Therefore, summary judgment on this issue is denied.

> **xi.   Did defendants breach the property management agreement by improperly determining the management fee due to Atmosphere?**

Atmosphere contends that defendants improperly treated the costs of hotel renovations as operating expenses which, in turn, diminished the share of hotel profits owed to Atmosphere. As discussed in issue 8, *supra*, the property management agreement provided for the payment of a monthly management fee to Atmosphere. Under § 2.02, the management fee was paid out of the hotel's operating account. Docket 222-2 at 3. And pursuant to § 4.01, that management fee was calculated as "10% of pure net operating profit as defined earlier." Docket 222-2 at 10. The phrase "pure net operating profit" is not, however, "defined earlier" or anywhere else in the agreement. But the agreement contains definitions for two similar phrases.

First, recital J appears near the beginning of the document and provides:

> Atmosphere will charge an operating fee of 10% of pure net profit. Net profit is after debt, depreciation (ceiling of $400,000), insurance and property taxes and all operating expenses. Of course, it will not include capital expenses or renovation expenses.

Docket 222-2 at 2. Although recital J uses the phrases "operating fee" and "pure net profit" as opposed to "*management* fee" and "pure net *operating* profit," the substance of the recital roughly mirrors § 4.01. And while "net profit" itself is not defined, that phrase is commonly understood as a business's

resulting profit after subtracting its expenses from its revenue.[23] Thus, recital J provides a list of the specific expenses to be subtracted from revenue when calculating the hotel's net profit, and states that "it" does not include deductions for renovation expenses or capital expenses.

Next, § 4.01(e)(iv) provides a definition for "Net Operating Income," which is defined as "Gross Revenues less Operating Expenses other than taxes and insurance costs." *Id.* at 11. The phrase "net operating income" is neither said to be "pure" nor is it specifically designated as "net operating *profit.*" Nonetheless, the parties in their briefs occasionally refer to "net operating income" or "NOI" when describing the management fee rather than "net operating profit." *See, e.g.*, Docket 218 at 20 (Atmosphere's brief) (". . . Atmosphere is to be paid the Management fee, which is an Operating Fee of 10% of Net Operating Income."). Additionally, and despite being defined in the property management agreement, the phrase "net operating income" is not used anywhere else in the property management agreement. The phrase "Gross Revenue" is defined in § 4.01(e)(i), while §§ 1.02, 2.05, 2.06, 2.08, 2.11, 2.14, 3.01, and 3.04 designate certain expenditures as "Operating Expenses." None of those operating expenses, however, include expenses for renovation of the hotel. Thus, like the definition of "net profit" in recital J, the hotel's "net operating income" is calculated without deducting renovation expenses from the hotel's revenue.

---

[23] Oxford Dictionaries, http://www.oxforddictionaries.com/definition/english/net-profit?q=net+profit (last visited December 29, 2015).

Unlike the definition of "net profit" in recital J, however, the hotel's "net operating income" is calculated *without* deducting taxes and insurance costs. Therefore, the two phrases are not interchangeable. Because the definition in § 4.01(e)(iv) is subsequent to the general definition in § 4.01, the court concludes that § 4.01's use of "as defined earlier" means the definition in recital J is controlling. Reading § 4.01 and recital J together, Atmosphere was entitled to a fee equal to 10% of the hotel's net operating profit and the hotel's net operating profit is calculated by deducting the expenditures in recital J from the hotel's revenues. Additionally, the costs of hotel renovations are not to be deducted from the hotel's revenues for purposes of determining Atmosphere's share of net profit. Rather, defendants alone were responsible for bearing the cost of the hotel renovations. This conclusion is consistent with provisions of the licensing agreement that provide that "[Shiba], *at its sole expense*, shall . . . undertake the Adoba® Hotel Renovations of the Property." Docket 219-1 at 10.

The undisputed facts show that checks were drawn from the hotel's operating account on April 10, 2012, and August 14, 2012, and that the funds were deposited into bank accounts controlled by Shiba. The April 10, 2012 check was written for $15,342.03, and the August 14, 2012 check was written for $44,901.79. Defendants do not dispute that renovation expenses, among other things, were paid from those bank accounts. Similarly, defendants do not dispute that they received a number of wire payments in 2012 from hotel

69

operations and busing services that went into bank accounts controlled by Shiba.

What is not clear, however, is how those sums were treated for purposes of determining the monthly management fees for 2012.[24] For example, if defendants used the April 10, 2012 check for $15,342.03 for renovation expenses and counted that sum as an operating expense or capital expenditure for the month of April, that would result in Atmosphere receiving a management fee based off of an improper calculation of net profit. But Atmosphere has not shown that defendants improperly determined the monthly management fees that were due to it. Thus, summary judgment on this issue is denied. Accordingly, because Atmosphere has not met its burden of showing that it is entitled to judgment as a matter of law on any of its breach of contract theories, Atmosphere's motion for summary judgment is denied.

**B.    Defendants' Motion for Summary Judgment**

Defendants seek summary judgment to preclude Atmosphere from pursuing the remedy of rescission. Atmosphere resists the motion. For the following reason, the motion is denied.

**1.    Background**

---

[24] As for the fees due for the partial year of 2013, neither party has established how those fees should be calculated. Karim testified as to one estimation, but Atmosphere suggests the fee should be based on the industry standard without describing the standard. Thus, the parties will need to present evidence on this issue at trial.

70

The pertinent, undisputed facts are as follows:[25]

In 2011, Henderson and Karim began discussing the possibility of rebranding Karim's hotel into the first ever Adoba® brand hotel.[26] Those discussions resulted in the development of two written agreements–a licensing agreement and a property management agreement. In the Fall of 2011, Henderson sent to Karim draft copies of the two agreements in Microsoft Word format. Karim made numerous edits to both of the agreements.

On December 31, 2011, Henderson and Karim signed versions of the licensing agreement and property management agreement that Karim had edited. Henderson signed the agreements on behalf of Atmosphere and Karim signed the agreements on behalf of Shiba. Additionally, both Henderson and Karim's initials appear on every page of the two agreements.

On January 8, 2012, Henderson sent Karim an email that said:

> The management contract as well as the license agreement we
> wrote is really not good. It is basically a 90 day contract and not
> worth anything to you or Atmosphere. . . . I suggest we write an
> addendum that omits that 90 day out and we write legitimate
> reasons why either can terminate, or, write more basic language. I
> had to show the agreement to my insurance company, Lyle and
> Wells Fargo in order to get insurance, show my lawyer and to open

---

[25] In support of several of their statements of material fact, defendants rely on this court's order granting in part and denying in part Atmosphere's motion for a preliminary injunction. The court's factual findings concerning a preliminary injunction are not binding. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Like with Atmosphere's SMFs, the court will not presume its findings in that proceeding, without more, are undisputed. Nonetheless, although Atmosphere objects to defendants' reliance on those findings, Atmosphere also acknowledges the veracity of some, but not all, of defendants' assertions that rely on those findings. The findings that are undisputed are included here for the purpose of resolving this motion.

[26] The hotel was operated as a Radisson at the time.

71

up an operating account with benefits at Wells Fargo, I asked your approval prior to showing any of these parties the other day. In unison, all the parties I just mentioned state the contract is worthless with that 90 day out term for any reason written in the contract.

*See* Docket 35-1. Despite Henderson's request, no addendums, amendments, or other changes were made to the licensing agreement or property management agreement.

Atmosphere initiated this suit against defendants on May 20, 2013. Docket 1. On October 9, 2013, Atmosphere was permitted to amend its complaint. In its amended complaint, Atmosphere alleged for the first time that Karim made numerous alterations to the original licensing agreement and property management agreement that were never disclosed to Henderson in spite of the fact that Henderson signed the two agreements.

## DISCUSSION

Generally, "one who accepts a written contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation, or other wrongful act by another contracting party." *LPN Trust v. Farrar Outdoor Advert., Inc.*, 552 N.W.2d 796, 799 (S.D. 1996) (quoting *Flynn v. Lockhart*, 526 N.W.2d 743, 746 (S.D. 1995)). Thus, a party who voluntarily signs a contract even without reading it is ordinarily bound to its terms unless the party's failure to read the agreement is caused by special circumstances such as fraudulent inducement or mutual mistake. *Id.* at 799-800. As discussed in Part I, *supra*, Atmosphere has brought a cause of action

against defendants for fraudulent inducement and Atmosphere asserts that it may elect the remedy of rescission if it successfully proves its claim.

Even if Atmosphere was induced by defendants' fraud to sign the contracts, however, Atmosphere "may ratify the contract by [its] actions." *Shedd*, 533 N.W.2d at 244. The "[f]ailure of a party to disaffirm a contract over a period of time may ripen into ratification, especially if rescission will result in prejudice to the other party." *Id.* at 244-45 (citing *First State Bank of Sinai*, 399 N.W.2d at 898). Therefore, "[t]he party seeking rescission must do so promptly upon discovery of the facts which entitle them to rescind." *Id.* at 245 (citing SDCL 53-11-4). "The question of whether a rescinding party acted promptly is a question of law." *Id.*

First, defendants contend that Atmosphere (through Henderson) either knew that the agreements had been altered by Karim at the time the agreements were executed or shortly thereafter. They point to the fact that Henderson initialed each page of the contracts and Henderson's email dated January 8, 2012, that discussed the 90-day cancellation provision that was added by Karim. Thus, according to defendants, because Atmosphere discovered the facts that would have entitled it to rescind the agreements early on but chose not to seek rescission until over a year later, Atmosphere has ratified the parties' agreements.

Viewing the facts and all reasonable inferences in Atmospheres' favor, however, summary judgment must be denied. Although a party may be bound by its signature to a document that it signed even without reading it, the rule is

73

relaxed in cases where the signature was induced by fraud. *LPN Trust*, 552 N.W.2d at 799. That is what Atmosphere alleges to have occurred here. While Atmosphere acknowledges that Karim told Henderson that he added a 90-day termination provision into the property management agreement,[27] Atmosphere's allegations of fraud run far deeper than that. Henderson testified at the preliminary injunction hearing that a number of additional changes were also made. Docket 85 at 39-40. For example, Atmosphere asserts that Karim made numerous, subtle changes to the agreements such as deleting the word "not" from several provisions and changing mandatory language ("shall") to permissive language ("may"). Atmosphere also contends that Karim made changes that gave Shiba additional rights to Atmosphere's intellectual property that were not brought to Henderson's attention.[28] Thus, a reasonable jury

---

[27] Defendants asserted that Karim directed Henderson's attention to the cancellation language "in the contract" without elaboration. Docket 211 at 5. Atmosphere responded that Henderson was only directed to the language in the property management agreement. Docket 232 at 7. Both parties cite Henderson's testimony at the preliminary injunction hearing. Henderson was asked by the court whether Karim showed him the cancellation provision. Docket 85 at 42. Henderson testified that the change was "[t]o the management contract, yes." *Id.* Henderson was asked by the court if he meant "[t]o the management contract only?" to which Henderson agreed. *Id.* A reasonable jury could therefore credit Henderson's statement that he was only aware of the change to one of the documents.

[28] Defendants rely on Pumphrey's testimony at the preliminary injunction hearing. Defendants argue that the portion of her testimony where she testified that Henderson told her the 90-day cancellation provision was "nonnegotiable," Docket 80 at 42, suggests that Atmosphere was also aware of the change to the licensing agreement that would enable Shiba to keep Atmosphere's intellectual property if the licensing agreement was cancelled. It is not clear from her testimony whether Henderson only told her about the change to the property management agreement or if Henderson also told her

could find that Henderson believed, upon Karim's representation, that the agreements he signed on December 31, 2011, were materially the same as the originals that Henderson sent to Karim except for the one or two changes that Karim brought to Henderson's attention.

Similarly, although Henderson's January 8, 2012, email stated that he showed the agreements to his insurance company, his attorney, and Wells Fargo, the context of the email suggests that Henderson only discussed the cancellation provision that Karim pointed out to him. As Henderson's email concludes, those third-parties stated the contracts were "worthless" because of the 90-day cancellation option. Henderson testified at the preliminary injunction hearing that he did not become aware of the numerous changes to the documents until the summer of 2013. Docket 85 at 39-40. The court concludes there is a genuine dispute concerning the date that Henderson became aware of the numerous changes to the documents allegedly made by Karim.

Second, defendants assert that because the altered contracts remained in effect for over a year after the parties signed them, Atmosphere did not act promptly to seek rescission. Defendants note that Atmosphere's original complaint did not assert a cause of action for fraudulent inducement and that such an allegation was not made until several months into this litigation. The South Dakota Supreme Court has explained, however, that a party's delay in discovering the fraud is not determinative. *Sabbagh v. Prof'l & Bus. Men's Life*

about the change to the licensing agreement. The resolution of that issue is therefore for the jury.

*Ins. Co.*, 116 N.W.2d 513, 518 (S.D. 1962). Because the nature of fraud is to avoid detection, the law requires "that *after* discovering the fraud one must *then* rescind promptly." *Id.* (emphasis added). A reasonable jury could conclude that Atmosphere's failure to originally plead a cause of action for fraudulent inducement was because it had not yet discovered the extent of the fraud allegedly perpetrated by defendants. Moreover, even if Atmosphere was aware of the fraud prior to amending its complaint, "[w]hat might be prompt action in one case would not be so in another case. . . . The further query must be whether the delay [in seeking rescission] was long enough to prejudice the other party." *Knudsen v. Jensen*, 521 N.W.2d 415, 420 (S.D. 1994) (citations omitted); *see also Shedd*, 553 N.W.2d at 245. Defendants have made no showing that Atmosphere's delay in seeking rescission has resulted in prejudice. Thus, defendants are not entitled to summary judgment concerning Atmosphere's ability to pursue rescission.

## CONCLUSION

The court finds that some, but not all, of the communications sought to be excluded by Atmosphere as settlement negotiations are inadmissible. Similarly, the court deems some, but not all, of Atmosphere's SMFs as admitted. Atmosphere is not, however, entitled to summary judgment on any of its breach of contract theories. Defendants are not entitled to summary judgment on the issue of rescission. Thus, it is

ORDERED that Atmosphere's motion to exclude settlement negotiations (Docket 228) is granted in part and denied in part.

IT IS FURTHER ORDERED that Atmosphere's motion to deem facts admitted (Docket 243) is granted in part and denied in part.

IT IS FURTHER ORDERED that Atmosphere's motion for summary judgment (Docket 217) is denied.

IT IS FURTHER ORDERED that defendants' motion for partial summary judgment (Docket 210) is denied.

Dated January 29, 2016.

BY THE COURT:

*/s/Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE