UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| ATMOSPHERE HOSPITALITY MANAGEMENT, LLC, <br><br>             Plaintiff, <br><br>    vs. <br><br> SHIBA INVESTMENTS, INC., KARIM MERALI, and ZELJKA CURTULLO, <br><br>            Defendants. | 5:13-CV-05040-KES <br><br> ORDER DENYING DEFENDANTS' MOTION TO DISQUALIFY EXPERT WITNESS AND DENYING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES |

     Defendants, Shiba Investments, Inc., Karim Merali, and Zeljka Curtullo, move the court to disqualify Kevin Hanley as an expert witness for plaintiff, Atmosphere Hospitality Management, LLC. Docket 214. Atmosphere resists the motion. Additionally, Atmosphere moves the court for an award of attorneys' fees. Docket 262. Defendants resist the motion. The court denies both motions.

## BACKGROUND

     Atmosphere brought this action against Shiba and Merali to resolve issues related to a licensing contract and management contract between the parties.[1] The agreements enabled Shiba to operate a hotel in Rapid City, South Dakota, that it owns under Atmosphere's brand name, "Adoba," and gave

---

[1]     Curtullo was added as a defendant after Atmosphere was given leave to amend its complaint. *See* Docket 37.

management of the hotel to Atmosphere. This litigation began in 2013 after defendants terminated both agreements.

## I.     Defendants' Motion to Disqualify Kevin Hanley as an Expert

Defendants move to disqualify Kevin Hanley, Atmosphere's expert witness. Hanley has worked in the hotel industry since 1979. During that time, he has served primarily in corporate governance and managerial positions for several hospitality companies. Much of Hanley's recent work experience pertains to hotel financing, ownership, and real estate ventures. On October 17, 2014, after Hanley had been designated as Atmosphere's expert witness, Hanley was deposed by defendants.

During Hanley's deposition, he was asked about the scope of his employment with Atmosphere. He testified that the "general purpose" of his role as an expert was to analyze four documents: the proffered licensing agreement, the licensing agreement the parties ultimately signed, the proffered property management agreement, and the property management agreement the parties ultimately signed. Docket 216-1 at 4. More specifically, Hanley was hired to opine whether the terms and conditions used in those four documents were consistent with the terms and conditions that were typically used in similar contracts in the hotel industry. *Id.* Hanley's report concluded that the terms and conditions of the two proffered agreements were generally consistent with the standards in the hotel industry while the terms and conditions of the two executed agreements were not. Docket 231-3 at 4.

2

Attached to Hanley's report were copies of six hotel license agreements. Those agreements were created by Courtyard by Marriot, Wyndham Hotels, Comfort Inn, Doubletree by Hilton, Red Lion Hotels, and AmericInn Hotels. Hanley testified that those contracts were "included to reflect a sampling of what would be perceived as generally consistent with industry standards." Docket 216-1 at 5. Also informing Hanley's analysis was his "own experience over more than 30 years in reading franchise agreements and license agreements . . . including the many agreements that [he has] been a party to [him]self." *Id.* at 7.

Hanley testified that he compared the proffered and executed versions of the parties' contracts to the generally accepted standards in the hotel industry. *Id.* at 6. Hanley was then asked why his report did not explain where the parties' contracts differed from the six sample contracts that were appended to his report. He explained that such a task "was not within the scope of [his] employment." *Id.* at 7. But when asked whether he nonetheless compared the parties' contracts to the industry standards, Hanley reaffirmed that "[he] did compare them." *Id.*

Hanley was also asked a series of questions concerning the reasons why someone would want to enter into a franchise arrangement. For example, Hanley was asked whether "an attribute of a franchise [would] be a higher chance of success than a sole proprietor," whether "an attribute of a franchise [would] be selling power through name recognition of a known brand," and whether "an attribute of a franchise [would] be customer leads generated

3

through a systematic website or call center," among other things. *Id.* at 8. To these questions, Hanley generally responded that "[i]t may be." *Id.* Hanley explained that each could be a potential benefit of associating with a franchise but "whether it is or not [an actual benefit] would remain to be seen." *Id.* at 6. When asked whether any of those potential benefits were also attributes of the Adoba franchise, Hanley responded that he was "not familiar enough with all facets of the Adoba franchise system to be able to attest to that." *Id.* at 8. But Hanley explained that his understanding was that this was the first Adoba hotel in existence "[a]nd so many of the attributes that [defense counsel] described a moment ago I would not expect to be present in a franchise system that had [only] one or a few hotels." *Id.* at 8-9.

Hanley was also asked if he understood that the Adoba hotel was not actually part of a "franchise" in the legal sense. Hanley replied that he was not an attorney and could not address such semantic differences or their legal significance. *Id.* at 9. But when asked why he compared the parties' licensing agreement to a franchise agreement when the Adoba hotel is not part of a franchise, Hanley testified that "the word 'franchise' and 'license agreement' is often used interchangeably in the hotel sector, based on my experience." *Id.* He explained that "[t]here may or may not be subtleties beneath that, but industry participants often use the terms interchangeably." *Id.* at 5.

## LEGAL STANDARD

Defendants contend that state law governs the admission of expert opinion evidence in this case. Docket 215 at 5 ("The court's discretion is [sic] in

determining the admissibility of expert witnesses is governed by long-standing South Dakota law."). It does not. *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005) ("Since the admissibility of expert testimony in diversity cases is governed by federal law, we must focus on whether the proposed testimony meets the federal standard of admissibility.") (internal citation omitted). Rather, Federal Rule of Evidence 702 provides the governing standard. *Id.*

Under Rule 702, the trial court acts as a "gatekeeper" by screening a party's proffered expert testimony for its reliability and relevance. *Daubert v. Merrel Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony."). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." *Lauzon v. Senco Prods., Inc.*, 270

F.3d 681, 686 (8th Cir. 2001) (quoting *Weisgram v. Marley Co.*, 169 F.3d 514, 523 (8th Cir. 1999)). "The rule clearly 'is one of admissibility rather than exclusion.' " *Id.* (quoting *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991)). Thus, "[t]he exclusion of an expert's opinion is proper only if it is 'so fundamentally unsupported that it can offer no assistance to the jury[.]' " *Wood v. Minn. Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)).

The Eighth Circuit has determined that a district court should apply a three-part test when screening expert testimony under Rule 702.

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Lauzon*, 270 F.3d at 686 (internal citations and quotations omitted). With respect to relevancy, expert testimony will be relevant and helpful to the jury if it concerns matters beyond the general knowledge of average individuals. *See United States v. Shedlock*, 62 F.3d 214, 219 (8th Cir. 1995). With respect to an expert's qualifications, Rule 702 recognizes five bases for qualifying an expert, which include "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Significantly, "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006). Finally, with respect to reliability, "[a]s a general rule, the factual basis

of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (internal quotations omitted).

District courts have discretion in determining whether to admit expert witness testimony under Rule 702. *See In re Air Crash at Little Rock Ark., on June 1, 1999*, 291 F.3d 503, 509 (8th Cir. 2002). "That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion." *Kumho Tire Co.*, 526 U.S. at 152.  Nonetheless, the proponent of expert testimony must prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

## DISCUSSION

Defendants argue that Hanley's testimony could not assist the trier of fact. More specifically, they argue that Hanley's methodology is so unreliable as to render his conclusions about the standards in the hotel industry equally unreliable. According to defendants, Hanley only reviewed a small sampling of contracts from large, nationally recognized hotel franchises in order to discern standards in the hotel industry even though the Adoba hotel is not part of such a franchise. Additionally, defendants argue that Hanley never compared the parties' contracts to those used by the nationally recognized hotel franchises despite such a comparison being central to his employment as an expert. Finally, although defendants do not directly assert that Hanley is unqualified to render an expert opinion, they take issue with the fact that he could not testify

7

with certainty whether the parties' relationship bore the indicia of a traditional hotel franchise arrangement.

Turning to the three-step analysis identified by the Eighth Circuit, the court finds that Hanley's testimony would satisfy the relevancy requirement. Based on his experience in the hotel industry, Hanley was hired by Atmosphere to review the proffered and executed versions of the parties' contracts and to opine whether the terms and conditions in those agreements conformed to industry standards. One of Atmosphere's causes of action is for breach of contract. Whether defendants breached the terms of the property management agreement or licensing agreement is a question of fact. *Moe v. John Deere Co.*, 516 N.W.2d 332, 335 (S.D. 1994). Hanley's testimony could assist the trier of fact to determine whether defendants breached a provision of those agreements. Additionally, the property management agreement and the licensing agreement both contain clauses that indicate that the terms that are undefined in the agreements will have the meanings commonly ascribed to them in the hotel industry. Docket 219-1 at 1 (licensing agreement); Docket 219-2 at 12 (property management agreement). And to the extent the contracts are ambiguous, parol evidence describing how the similar terms are used in the hotel industry is admissible to construe the agreements. *Mash v. Cutler*, 488 N.W.2d 642, 647 (S.D. 1992) ("In construing a contract where ambiguities exist, established trade customs and usages may ordinarily be considered."). Thus, Hanley's testimony would be also be relevant to the determination of

what those undefined terms mean or how ambiguities in the contracts could be interpreted.[2]

The court also finds that Hanley is qualified to testify as an expert. He has worked in the hotel industry for over thirty-five years and has personal experience reviewing and negotiating numerous hotel franchise/licensing agreements. Although defendants take issue with Hanley's responses to their questions about the attributes of a hotel franchise arrangement, that is not the basis for Hanley's designation as an expert. Specifically, Hanley was not employed by Atmosphere to analyze the relationship between Atmosphere and defendants to determine if that relationship was factually analogous to a typical hotel franchise relationship. Rather, Hanley was asked to review the parties' contracts to determine if the terms and conditions of those contracts were similar to the terms and conditions that typically appeared in hotel franchise agreements. Contrarily, defendants' questions were more closely aimed at testing Hanley's knowledge of the economic or strategic motivations for entering a franchise agreement rather than testing his experience, knowledge, or familiarity with how hotel franchise agreements are typically worded. Additionally, defendants have provided no authority that Hanley's

---

[2] Atmosphere also suggests that Hanley's testimony would be relevant in the event that Atmosphere succeeds on its fraud in the inducement claim and pursues the remedy of rescission. According to Atmosphere, Hanley could testify concerning the reasonable value of Atmosphere's services and intellectual property. Atmosphere has not identified any portion of Hanley's report or his testimony that suggests he could competently testify to those areas. Because the court has already determined Hanley's testimony hotel industry terminology would meet the relevancy requirement, the court need not resolve Hanley's qualifications on those other issues at this time.

responses to those questions, i.e., that whether something was truly a "benefit" of a franchise agreement depended on the specific circumstances of the arrangement, were inaccurate. Similarly, defendants have not offered any evidence to undermine Hanley's assertion that the phrases "franchise agreement" and "license agreement" are used interchangeably by individuals in the hotel industry. But even if defendants had presented contrary evidence, such evidence would only go to the weight the jury may give his opinion rather than its admissibility. Lastly, the fact that Hanley could not testify to the legal significance of being a franchisor-franchisee is not a basis for disqualifying him as an expert. In sum, the court is satisfied that Hanley has sufficient specialized knowledge within the hotel industry to assist the trier of fact.

Finally, the court also finds that Hanley's testimony bears the indicia of reliability necessary to assist the trier of fact. Hanley testified that his years of experience in the hotel industry, his experience reviewing and negotiating franchise agreements, and his review of several other materials, provided him with the means to determine whether a given contract does or does not conform to standards in the hotel industry. The Supreme Court in *Kumho Tire* observed that " . . . the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire*, 526 U.S. at 150; *see also Cedar Hill Hardware & Const. Supply, Inc. v. Ins. Corp. of Hanover*, 563 F.3d 329, 343 (8th Cir. 2009) (observing that an expert's "exhaustive experience in the insurance industry" was a basis for his testimony concerning "industry-standard context" concerning practices in the insurance industry). Therefore, Hanley's hands-on,

10

personal experience with the standards employed in hotel franchise agreements adds reliability to his testimony concerning that very topic.

Defendants' arguments concerning the unreliability of Hanley's methodology are not supported by the record. First, defendants assert that Hanley testified that he relied on only the six franchise agreements appended to his report as determinative of the relevant industry standards. But Hanley did not make such a statement. Rather, he explained that he relied on "[his] own experience over more than 30 years in reading franchise agreements and license agreements between not only those companies that those [six] documents reflect, but other agreements by other brand companies, including the many agreements that [he has] been a party to [him]self." Docket 216-1 at 7. In other words, it was not Hanley's reading of those six documents alone that allowed him to discern what the industry standards were. Instead, it was also his professional experience working with those very standards.

Second, defendants argue that Hanley testified that the six franchise agreements appended to his report were, in fact, the relevant industry standards. But Hanley did not make such a statement. Rather, he explained that those six documents were intended to "reflect a sampling of what would be perceived as generally consistent with industry standards." *Id.* at 5. Thus, Hanley testified that those documents were examples of agreements that were generally consistent with the industry standards, but not that they represented what the industry standards were in every case.

11

Finally, defendants contend that Hanley testified that he never performed a certain comparison of the parties' agreements. On this point, Hanley's testimony is as follows:

Q:    Well, you set forth a summary of conclusions where you compared the two contracts, the executed versus the proffered. But I see nothing where you compared the proffered and your [six] franchise agreements, which I'm supposed to take as industry standards. Why don't I see that?

A:    I did not prepare that summary.

Q:    Why not?

A:    It was not within the scope of my assignment.

Q:    If your job was to determine if the proffered agreements met industry standards, wouldn't you compare them side by side and make an analysis?

A:    I did not.

Q:    But that was your scope of work[,] to determine whether these documents met industry standards. And you didn't compare them?

A:    I did compare them.

*Id.* at 6-7. The problem with defendants' argument is two-fold. Initially, it relies on the faulty assumption that those six sample agreements were the industry standards. But Hanley testified that they were merely samples or examples of what is typically contained in a hotel franchise agreement, not that a contract had to be consistent with (and only with) those six documents to conform to the industry standards. Next, that first faulty assumption was folded into another: that because Hanley's report did not detail how the parties' agreements compared to the six sample agreements, that Hanley did not

actually compare the parties' agreements to the industry standards at all. But that conclusion is rebuffed by Hanley's response that he "did compare them." *See also* Docket 231-10 at 11 ("I called forward differences between the proffered and the executed agreements and compared those to generally accepted industry standards."). Thus, defendants' arguments do not undermine the reliability of Hanley's proffered testimony.

Based upon Rule 702 and the factors identified by the Eighth Circuit, the court finds that Hanley's proffered testimony is relevant, reliable, and would be useful to the jury. Therefore, defendants' motion to disqualify Hanley from serving as an expert is denied.

## II.   Atmosphere's Motion for Attorneys' Fees

On July 29, 2015, the court entered an order dismissing defendants' third-party complaint and counterclaims as appropriate sanctions for defendants' repeated discovery violations. Atmosphere requests an award of attorneys' fees for the dismissal of those claims.[3] According to Atmosphere, it is the prevailing party with respect to those claims and the parties' contractual agreements contemplate the payment of such fees under these circumstances.

### LEGAL STANDARD

In diversity proceedings, state law governing the provision of attorneys' fees is generally considered "substantive" and thus controlling for purposes of the *Erie* doctrine. *Ferrell v. West Bend Mut. Ins. Co.*, 393 F.3d 786, 796 (8th Cir.

---

[3] This request for attorneys' fees is separate from the attorneys' fees that the court awarded to Atmosphere for pursuing its motion to compel, Docket 173 (awarding $8,357.00), and the court's award of attorneys' fees following the court's order for sanctions. Docket 258 (awarding $4,422.32).

2005); *see also Lamb Eng'g & Const. Co. v. Neb. Pub. Power Dist.*, 103 F.3d 1422, 1434 (8th Cir. 1997). "South Dakota generally follows the 'American Rule' on attorney's fees, under which each party usually bears the cost of their own attorneys." *Hewitt v. Felderman*, 841 N.W.2d 258, 264 (S.D. 2013). "There are two exceptions to this rule: 'first[,] when a contractual agreement between the parties entitles the prevailing party to attorney fees, and second[,] when an award of attorney fees is authorized by statute.' " *Eagle Ridge Estates Homeowners Ass'n, Inc. v. Anderson*, 827 N.W.2d 859, 867 (S.D. 2013) (alterations in original). Even if attorneys' fees are recoverable, the award of such fees must always be reasonable in light of the services rendered. *Id.*

## DISCUSSION

Atmosphere argues that it is entitled to attorneys' fees under the "contractual agreement" exception to the American Rule. Because there are two contracts at issue, the court begins its analysis with the licensing agreement. Section 18 of the licensing agreement provides:

> In any arbitration or other legal proceedings required to interpret or enforce this Agreement or to resolve any dispute related to this Agreement, the prevailing party shall be entitled to recover all costs, expenses, expert-witness fees, and attorneys' fees related thereto except for certain costs and expenses of arbitration as specifically provided below.

Docket 219-1 at 18. This section therefore entitles the "prevailing party" of any legal proceeding required to resolve any dispute related to the agreement to their attorneys' fees. The language of the clause is broadly worded and would apply to the attorneys' fees Atmosphere paid to defend itself against

defendants' claims, provided that Atmosphere is a prevailing party. Defendants acknowledge that this section "clearly sets out the right by a party to that agreement to recover costs and fees in the event of a dispute or litigation." Docket 273 at 5. But this section's repeated use of "this Agreement" establishes that the clause's reach is limited to those disputes that arise under the licensing agreement itself and not the property management agreement. Because defendants' causes of action sought to establish defendants' rights and Atmosphere's liability under the licensing agreement as well as the property management agreement, the court must also look to the property management agreement.

Atmosphere acknowledges that the property management agreement does not contain a provision like § 18 of the licensing agreement. Atmosphere argues, however, that several sections of the property management agreement establish Atmosphere's right to collect attorneys' fees under that agreement as well.

Atmosphere asserts that its attorneys' fees are recoverable as "operating expenses" under the property management agreement. Section 2.02 obligates defendants to pay operating expenses. Docket 219-2 at 3 ("All amounts requested by Atmosphere to pay Operating Expenses . . . or other agreed-upon expenditures shall be remitted by [Shiba] to Atmosphere within five days of Atmosphere's request therefor."). The phrase "operating expenses" is not itself defined, but §§ 1.02, 1.03, 2.05, 2.06, 2.08, 2.11, 2.14, 3.01, and 3.04 all designate certain expenditures as operating expenses. The closest of those

provisions to arguably cover the payment of Atmosphere's attorneys' fees as operating expenses is § 2.08. That section provides:

> Atmosphere is authorized to engage such legal counsel and accounting services as are reasonably necessary for the operating and maintenance of the Property, including without limitation the acquisition and maintenance of Licenses for the service of alcoholic beverages. The costs and expenses of such services shall be charged as Operating Expenses.

*Id.* at 5. Atmosphere argues that the attorneys' fees it paid to defend itself against defendants' claims were "reasonably necessary for the operat[ion] and maintenance" of the hotel and are therefore operating expenses which defendants must pay. The court disagrees. First, a natural reading of this section does not give Atmosphere a blank check for attorneys' fees as long as it litigates some issue tangentially related to the parties' rights and obligations under the property management agreement. Rather, to be recoverable under § 2.08, the attorneys' fees must be expended for a purpose that benefits the operation of the hotel such as the legal fees necessary to acquire a license for the sale of alcoholic beverages on the property, for ensuring compliance with state and local real estate or taxation requirements, and so on. Second, Atmosphere's reading would give it the right to collect attorneys' fees regardless of which party prevailed. Under that view, Atmosphere would still be entitled to its attorneys' fees even if it were Atmosphere's claims that were dismissed. Finally, Atmosphere's equation of attorneys' fees with operating expenses could give defendants the right to refuse payment. The amount of attorneys' fees currently requested by Atmosphere is approximately $101,414.00. Although it is not clear from Atmosphere's request what fees were paid in relation to the

16

property management agreement itself, recital H provides that any expenses over $50,000 need to be approved by defendants. *Id.* at 2. For these reasons, Atmosphere's generalized equation of attorneys' fees with operating expenses is not supported by the language of the agreement.

Next, Atmosphere relies on provisions of the property management agreement that relate to insurance coverage and indemnification. Atmosphere argues that defendants agreed to provide indemnification in the form of attorneys' fees. Section 3.02 pertains to certain situations wherein defendants agreed to indemnify Atmosphere. That section provides in part that:

> Provided that Atmosphere has purchased insurance coverage providing the duty to defend and indemnify and only the limits of coverage available under said policies, [Shiba] shall indemnify, defend, and hold harmless Atmosphere, its subsidiaries, and its affiliates and their respective officers, directors, agents, and employees, from and against any and all claims, liabilities, losses, damages, costs, and expenses of any kind or character, including without limitation court costs, reasonable attorneys' fees, expert witness' fees, interest, fines, and penalties, arising from or related to the management, operation, or maintenance of the Property[.]

*Id.* at 9. Although this section does discuss the payment of attorneys' fees, the first sentence explains that defendants' duty to indemnify Atmosphere or pay for such fees becomes operable only if "Atmosphere has purchased insurance coverage providing the duty to defend and indemnify[.]" If such a policy exists, Atmosphere has not brought it to the court's attention.

Atmosphere also relies on § 3.04 that blends together Atmosphere's indemnification and operating expenses theories. That section provides:

> Provided that allegations are not based on fraud or gross negligence and that there is insurance in place covering the same, all costs and expenses, including without limitation reasonable

17

> attorneys' fees, of any legal proceedings that are instituted against the Property, Atmosphere, or both related to the operation, management, or maintenance of the Property, including without limitation any employment-related claims of any nature, shall be charged as Operating Expenses; provided, however, that Atmosphere shall be responsible for said cost to the extent the same is/are based on allegations of fraud or gross negligence of any of Atmosphere's employees, corporate-office personnel in the management, operation, or maintenance of the Property.

*Id.* at 9-10. This section, like § 3.02, has as a prerequisite "insurance in place covering the same[.]" Again, there is no evidence that Atmosphere has such a policy applicable to this litigation. And like § 2.08, the expenditure of attorneys' fees must have been "related to the operation, management, or maintenance of the Property[.]" While Atmosphere was arguably sued for mismanagement of the hotel, that does not obviate the need for insurance coverage or the fact that this provision is more naturally read to apply to events like guest slip-and-falls or suits by employees. Regardless, the court concludes that Atmosphere is not entitled to recover its attorneys' fees under §§ 3.02 or 3.04. Thus, Atmosphere has not shown that it has a right to recover its attorneys' fees under any provision of the property management agreement.

Although Atmosphere has not identified a right to recover its attorneys' fees under the property management agreement, it may be able to recover at least some of its fees under the licensing agreement. As discussed above, Atmosphere currently seeks an award of attorneys' fees totaling approximately $101,414.00. Although it is not clear from the billing records submitted by Atmosphere how those fees are split (assuming they can be) between the two

18

agreements, Atmosphere would still need to be a "prevailing party" for it to recover any of its attorneys' fees pursuant to the licensing agreement.

The licensing agreement does not define when a party becomes a "prevailing party" for purposes of collecting attorneys' fees under § 18. In *Northwest Airlines, Inc. v. Flight Trails*, 3 F.3d 292 (8th Cir. 1993), the Eighth Circuit addressed a similar scenario. There, the parties' contract stated that " '[i]f Seller or Purchaser pursues any remedy to which it is entitled pursuant to this Section 9.01, the prevailing party shall be entitled to all reasonable costs and expenses incurred thereby, including attorneys' fees.' " *Id.* at 297 (alteration in original). The Eighth Circuit applied the law of Minnesota. *Id.* Thus, the law of South Dakota provides the rule of decision in this case.[4]

In *Crisman v. Determan Chiropractic, Inc.*, 687 N.W.2d 507 (S.D. 2004), the South Dakota Supreme Court addressed a contract with language similar to § 18 of the licensing agreement. In *Crisman*, the parties' agreement provided that "[i]n the event that any legal action or arbitration is filed in connection with this agreement, the prevailing party shall be entitled to all costs and reasonable attorney fees in any such action relating to this agreement." *Id.* at 512. With no additional definition provided by the agreement, the South Dakota Supreme Court held that "[t]he prevailing party is the party in whose

---

[4] Atmosphere argues that the definition of "prevailing party" used by the Eighth Circuit in *Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 683 F.3d 903 (8th Cir. 2012) controls. That case involved a claim for attorneys' fees under a federal statute, § 1988, which provided for the payment of attorneys' fees to the "prevailing party" in certain civil rights disputes. *Id.* at 908-09. In *Rogers*, the Eighth Circuit interpreted federal law, not a private contract, and no such statute is applicable here.

19

favor the decision or verdict is or should be rendered and judgment entered.' " *Id.* at 513 (quoting *City of Aberdeen v. Lutgen*, 273 N.W.2d 183, 185 (S.D. 1979)). "The term 'judgment' refers to a judgment which is final rather than interlocutory." *Riede v. Phillips*, 277 N.W.2d 720, 722 (S.D. 1979).

First, Atmosphere has not achieved prevailing party status at this time because there has been no final adjudication of this litigation. *See Noble for Drenker v. Shaver*, 583 N.W.2d 643, 649 (S.D. 1998) ("At this time there is no prevailing party in this case. There are still issues to be decided[.]"). Second, Atmosphere is not the prevailing party with respect to defendants' third-party complaint and counterclaims because the court dismissed those claims on procedural grounds rather than on their merits. *See Ridley v. Lawrence Cty. Comm'n*, 619 N.W.2d 254, 259 (S.D. 2000) (rejecting a party's argument that it was the prevailing party because "[t]he petitioners' case was dismissed not on its merits, but for failure to pursue the proper procedure."). In fact, in the court's order denying defendants' motion for reconsideration, the court plainly stated: "The court's earlier dismissal of defendants' claims was not related to any determination that the claims were meritless." Docket 288 at 30. Because Atmosphere is not the prevailing party with respect to those claims, it is not entitled to attorneys' fees.

## CONCLUSION

The court concludes that Hanley's proffered testimony is relevant, reliable, and would be useful to the jury. Therefore, he will not be disqualified as an expert. The court also finds that Atmosphere is not entitled to attorneys'

fees for the court's dismissal of defendants' third-party complaint and counterclaims. Thus, it is

ORDERED that defendants' motion to disqualify Kevin Hanley as an expert witness (Docket 214) is denied.

IT IS FURTHER ORDERED that Atmosphere's motion for attorneys' fees (Docket 262) is denied.

Dated January 29, 2016.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE